**Affirmed and Opinion filed August 14, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-11-00406-CR
### NO. 14-11-00407-CR

**RAVEN RYON LOVINGS, Appellant,**

**V.**

**THE STATE OF TEXAS, Appellee.**

**On Appeal from the 337th District Court**
**Harris County**
**Trial Court Cause Nos. 1249643 & 1249644**

## O P I N I O N

Appellant Raven Ryon Lovings was charged with aggravated sexual assault in two causes. A jury found him guilty of the lesser included offense of sexual assault and the trial court sentenced him to ten years' confinement in both causes, to be served concurrently. On appeal, Lovings contends (1) he was egregiously harmed by the trial court's failure to include the applicable statutory definitions of "without consent" in the jury charge; and (2) the evidence is insufficient to convict him in either cause because the evidence "conclusively establishes reasonable doubt as to the complainant's lack of consent." We affirm.

# I

In January 2009, the complainant was staying with her family at the Reed Motel when she met Lovings, who was dating the complainant's sister. Lovings came to the motel to see the complainant's sister, but she was not there. While Lovings waited for the complainant's sister to return, he engaged in pleasant conversation with the complainant and her mother in their room. The complainant knew Lovings only as "Raven." At some point, the complainant's mother asked Lovings to drive the complainant to a store to run an errand for her. Lovings agreed, and he and the complainant got in Lovings's car. At that point, their versions of events sharply differ.

According to the complainant, she had been "chilling out" and getting high with two men just before she met Lovings. She admitted she was using drugs heavily at the time, and she and the two men had shared a cigarette laced with PCP. When the men wanted to follow the complainant into her motel room, she refused to let them inside. Lovings later told her he had made the men leave. The complainant thought Lovings seemed like a nice guy, so when her mother asked Lovings to drive her to the store, the complainant agreed. As they drove, however, Lovings repeatedly asked the complainant to go to his house. The complainant refused. They began to talk about getting some drugs, and the complainant directed him to a house where they could buy some. After arriving at the house, Lovings gave the complainant $10 for cocaine. She went in, purchased the cocaine, and returned to the car.

As Lovings and the complainant continued on their way, they were talking and "all of sudden" arrived at Lovings's house. The complainant refused to go in with Lovings, so he went in alone. After a minute or so, Lovings came back out to the car and asked the complainant to come in and help him look for his marijuana. She agreed, thinking she would not be in the house long. Lovings immediately went to his bedroom and began "hitting" the cocaine. The complainant sat on the edge of the bed. Lovings asked the complainant if she wanted to "hit" the cocaine, and she said, "No, I'm not hitting that because you might think I'm here to do something with you and — no."

Lovings told the complainant, "It's not like that," and so she agreed to "hit" the cocaine with him.

After they used the cocaine, the complainant told Lovings they needed to leave, but Lovings hit the complainant and said, "You're not going nowhere . . . get your ass back on that bed." Fearing for her safety, the complainant did as Lovings told her. The complainant then saw a knife on the dresser. In an attempt to protect herself, she grabbed the knife and "went for him in his chest area." They wrestled over the knife, and Lovings eventually overpowered the complainant. As the complainant tried to hold onto the knife, she pulled on the sharp edge and cut her finger "wide open." The knife broke in half.

Lovings wrestled the complainant to the floor and put his foot on her neck. He began hitting her, yelling, "bitch . . . you tried to stab me." Lovings threatened to kill the complainant if she did not get on the bed and take her clothes off. Fearing for her life, the complainant complied, and Lovings began raping her. Lovings first sexually assaulted the complainant vaginally, and then he turned her around and sexually assaulted her anally. the complainant pleaded with Lovings to stop because it hurt, but he told her to "shut up" as he continued to rape her.

Throughout these attacks, Lovings continued to beat and threaten the complainant. At one point Lovings threatened to call other men over to gang rape the complainant; at another point, he threatened to put her in the trunk of his car. The complainant was afraid and believed him. Lovings would not let the complainant out of his sight while he was awake, and when he slept he kept his arm around her so that she could not leave. The complainant tried to sneak away, but he awoke and began hitting and sexually assaulting her again. the complainant's face began to swell from the blows.

The next day, the complainant told Lovings she was pregnant and needed to get something to eat, but Lovings would not let her leave. He also refused to let her call anyone. The complainant repeatedly asked him to take her to get something to eat, and around noon he finally agreed to take her to McDonald's. Lovings gave the complainant a sock with which to wrap her finger, but he refused to let her put her underwear or jacket

3

on. Although the complainant had a can of mace in her jacket, she was afraid to try to use it because her earlier attempts to defend herself had been unsuccessful.

When Lovings and the complainant left the house, the complainant ran from him and tried to get the attention of people nearby. Lovings pulled up to the complainant in his car, but she refused to get in. Instead, she ran down the street, crying and screaming for help. The complainant went inside a convenience store where a stranger helped her get change to call the police. An ambulance arrived and took the complainant to the hospital.

At the hospital, the complainant told Officer Raul Yzquierdo of the Houston Police Department what had happened to her. The complainant also recounted the assaults to the hospital personnel and she was given a sexual-assault examination. About a month after the complainant was released from the hospital, Yzquierdo picked her up and drove her to a police station, where he showed her photographs of possible suspects. The complainant identified Lovings as her assailant.

Lovings did not testify at trial, but the prosecution presented to the jury a lengthy video statement he made to Yzquierdo and Sergeant Brian Harris. The jury heard Lovings explain that he went to the Reed Motel to wait for his girlfriend, the complainant's sister, with whom he had plans that evening. He prevented the two men who had been with the complainant from entering the motel room she was sharing with her mother and sister. The two men told him they each had given the complainant $20 of "powder" and she had agreed to have sex with them. After the men left, Lovings visited with the complainant and her mother while waiting for the complainant's sister to arrive. He was drinking. The complainant's sister kept coming in and then going outside and driving off with other men. Lovings grew increasingly upset and drank too much. The complainant wanted him to take her to get more "powder" and he told her she had already had enough.

When the complainant's mother asked the complainant and Lovings to go to the store for her, the complainant grabbed his arm and they went to the car. As he drove, the complainant asked him for $10 and directed him to a house, which he recognized as the

4

house where the complainant's sister bought cocaine. The complainant went into the house and came back with cocaine. Lovings took the cocaine from her and told her it was for her sister. He drove to his house while the complainant kept asking for the cocaine.

When they arrived at his house, Lovings went in and left the complainant outside. He went to sleep in his bedroom. Sometime later he was awakened by the complainant bursting through the door and insisting that he give her the cocaine. At first he refused, but eventually he relented and gave her some. The complainant wanted more cocaine and became aggressive. Lovings turned away from her to return to his bedroom, and the complainant stabbed him on the back of his shoulder with a knife. He showed the interviewing officers a cut on his back. Lovings accused the complainant of trying to kill him, and he punched her several times in self defense. The complainant began to cry and told Lovings that CPS had just taken her seven children. Lovings saw that the complainant had cut her finger while holding the knife and was bleeding, but she said she did not care. Lovings pried her fingers open and took the knife from her. He did not know how the knife broke. The complainant kept asking him to give her the cocaine and to drive her home. He told her he would not drive her home because he had been drinking.

Lovings said he talked with the complainant a long time, telling her she needed to get off drugs, get God in her life, and show CPS she could be a good mother. He gave her the cocaine on the condition that there be no more "drama." Later, the complainant got into bed with him, and they had both vaginal and anal consensual sex. In the morning he awoke to find her "messing with" him and they had sex again. She told him she needed food because she was pregnant and asked him to take her to McDonald's. Lovings was very worried about the complainant's sister and mother finding out about their night together and he let her know they had no future together. The complainant's attitude toward him began to change. They got dressed and went to the car; Lovings asked if the complainant wanted to drive or if she wanted him to drive. She said, "I'm OK," and went across the street. He went to McDonald's by himself.

5

When Lovings returned home from McDonald's, his relatives were outside his house and a cousin told him the police were on the way because a woman had reported that he raped her. Lovings immediately drove to the Reed Motel to talk to the complainant's sister and mother to ask them if the complainant had mental or emotional problems. The complainant's sister told him the complainant was at the hospital and had said her face was swollen.

The jury also heard from other witnesses who testified concerning the incident. Officer Reese Hardy testified that he responded to the sexual assault call. He arrived at Lovings's residence and received permission from the owner to enter. Inside, he saw blood on the floor, bloody rags or towels, and a broken knife handle near a bedroom. In the bedroom, he saw female clothing and a pair of panties on the floor.

Officer Yzquierdo testified that when he interviewed the complainant, she was able to give a physical description of her assailant and his first name, "Raven." She also described him as having the word "Beast" tattooed on his chest. Yzquierdo saw no indication that the complainant was intoxicated or high on drugs. Officer Yzquierdo's investigation led him to Lovings. Yzquierdo prepared a photo lineup that included Lovings for the complainant to review. When the complainant reviewed the lineup, she identified Lovings as her assailant. Yzquierdo also conducted a more detailed interview with the complainant in which she admitted she had been using drugs and she went into Lovings's house to look for marijuana, but she denied it was a "sex-for-drugs situation."

Officer Harris, who interviewed Lovings, testified that in his opinion, Lovings was very egotistical, "almost had a superiority complex," and viewed himself as a "redeemer" of women. Harris formed his opinion of Lovings in part based on documents Lovings authored which Harris reviewed in preparation for the interview.[1] Harris also testified

---

[1] The State introduced one of Lovings' writings found in a spiral notebook titled "Beast on a Bike," which read as follows:

One night a 27 year old woman was walking at 12:30 pm. She ran into a beast on a bike. She said she was going to the store, although all stores were close[d] — but she wanted him to pump her on his bike. She hop[p]ed on the handle bars, and she said she could not

6

that based on his interview of Lovings, he concluded Lovings was "fairly intelligent" and thought that Lovings's answers "were extremely well-calculated to account for any type of physical evidence."

Dr. Megan McCarthy testified that she performed the sexual-assault examination on the complainant. She explained that the complainant's medical records reflected that she complained of repeated physical and sexual assault and was suffering emotional distress. The complainant also had a laceration on her finger, a bruised eye, and redness on her elbow. Dr. McCarthy also confirmed that the complainant was twenty-seven years old and pregnant. The pelvic exam Dr. McCarthy performed on the complainant revealed no signs of trauma in either the vaginal or rectal areas, but Dr. McCarthy explained that a lack of trauma does not necessarily mean that a sexual assault has not occurred because "the vagina is very accommodating for intercourse." Another factor was the complainant's vaginal deliveries of at least six of her children, which Dr. McCarthy explained could result in a "laxity in the muscles of the perineum." Dr. McCarthy also explained that multiple births could result in "tissue laxity" of the anus, but she acknowledged she was not an expert in that area. She also admitted she did not check for sphincter damage caused by multiple vaginal deliveries. However, she testified that most sexual assaults do not result in signs of trauma.

Claudette Nance, a neighbor of Lovings, also testified. She was sitting in her yard with her daughter and some friends when she saw Lovings and a woman come out of his house and begin walking toward his car. When they got near the driveway, the woman "jumped the ditch" and said, "Y'all know him? He raped me." Nance heard Lovings say, "Girl, what are you doing? We [are] fixing to get something to eat." The complainant then ran down the street looking for help. Lovings got in his car and left, returning a short time later with some food. By then, many people had gathered around his house.

get off until she got to his house. When they got inside Beast beat and raped her and rode off into the sunset. The pussy must have been bad. No one has seen him since. You decide, breaking news or joke.

In his police interview, Lovings explained that a cousin gave him the nickname "Beast."

7

Someone told Lovings he was accused of rape, and Lovings drove off. Nance never saw him again.

## II

In his second issue, Lovings contends the evidence is insufficient to convict him of sexual assault in either case because the evidence conclusively establishes reasonable doubt as to the complainant's lack of consent.[2]

## A

When addressing a sufficiency challenge, we review the evidence in the light most favorable to the jury's verdict to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). We give deference to the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony and is free to accept or reject any or all evidence presented by either side. *See Lancon v. State,* 253 S.W.3d 699, 707 (Tex. Crim. App. 2008).

A person commits sexual assault if he intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means, without that person's consent. Tex. Penal Code § 22.011(a)(1)(A). Section 22.011 lists eleven circumstances that constitute "without consent." *Id.* § 22.011(b)(1)–(11). Of those, the State and Lovings agree the statutory definitions applicable here provide that a sexual assault is without the consent of the other person (1) if the actor compels the other person to submit or participate by the use of physical force or violence; or (2) the actor compels

---

[2] The only difference between the two charges is the manner in which the sexual contact occurred. In case number 1249643, Lovings was charged with the penetration of the complainant's anus; in cause number 1249644, Lovings was charged with the penetration of the complainant's female sexual organ.

the other person to submit or participate by threatening to use force or violence against the other person, and the other person believes that the actor has the present ability to execute the threat. *Id.* § 22.011(b)(1), (2).

B

Lovings contends the evidence conclusively establishes a reasonable doubt as to whether he acted without the complainant's consent in both causes and therefore the evidence is insufficient to support his convictions. First, Lovings argues that the complainant's credibility is undermined by direct and undisputed evidence that contradicts her testimony. Lovings points out the complainant testified she tried to stab Lovings "in the chest area," but in the video, Lovings showed Harris a cut on his back, not his chest. According to Lovings, this evidence supports his version of events. Lovings also points out the complainant testified she had a can of mace in her jacket, and argues that if that is true and she was wearing it when she was pushed onto the bed, she would have had the means available to protect herself. Conversely, he posits, if the complainant was not wearing the jacket, her testimony that she had no intention of staying is "severely weakened."

Lovings also argues that the complainant's recollection of events is suspect. He points out that the complainant testified, "I remember exactly what happened," but then was unable to remember certain details of the assault, such as whether she or Lovings removed some of her clothing and whether Lovings used a condom or lubricant. Lovings also maintains that the complainant's admitted heavy drug use and her testimony that she had been getting high on PCP with two men just before her encounter with Lovings shows that "by the time she took the hits she admits taking from Mr. Lovings, her consciousness would have been altered and her memory suspect." Finally, Lovings argues her medical exam revealed no evidence of rape, and the lack of trauma to her vagina or anus undermines her claim that she was raped repeatedly all night. Lovings contends the cumulative effect of the evidence shows that "no rational jury would fail to have reason to doubt all her testimony." We disagree.

9

As noted above, a sexual assault is without consent if "the actor compels the other person to submit or participate by the use of physical force or violence." Tex. Penal Code § 22.011(b)(1). The complainant testified that she specifically sought Lovings's assurance that he did not expect to have sex with her if she used his cocaine. But when she tried to leave, Lovings beat her and told her to get back on the bed. The complainant testified that she thought Lovings was going to kill her. The complainant tried using a knife to defend herself but was overpowered and beaten, and she remembered thinking, "well, I just knew I was dead." At that point, the complainant acquiesced to Lovings's demand that she get back on the bed, and the sexual assaults began. The complainant testified she did not want to have sex with Lovings and conveyed that to him by telling him "no" and begging him not to rape her. Thus, a rational jury could have concluded that Lovings used physical force and violence to compel the complainant to submit to the sexual acts, and her testimony was corroborated by her physical injuries and the evidence collected at the scene.

A sexual assault also may be without consent "if the actor compels the other person to submit or participate by threatening to use force or violence against the other person, and the other person believes that the actor has the present ability to execute the threat." When a complainant has previously been beaten for refusing sexual advances from a person, the mere demand for sex from such person on subsequent occasions carries with it an implicit threat of beating and is sufficient to show a lack of consent. *See Graves v. State*, 994 S.W.2d 238, 244 (Tex. App.—Corpus Christi 1999, pet. ref'd, untimely filed).

A rational juror could have found beyond a reasonable doubt Lovings compelled the complainant to submit or participate by threatening to use force or violence against her, and she believed he had the ability to execute the threat. The complainant testified that Lovings beat her and he repeatedly said, "If you don't do what I say, I'll kill you." Because she believed him, she got onto the bed on her own. During the sexual assaults, Lovings continued to threaten the complainant, at one point telling her he was going to

10

"call some boys over" to gang rape her, and at another point, telling her he was going to put her in the trunk of her car. The complainant testified that she believed him and she was afraid.

As Lovings acknowledges, a complainant's uncorroborated testimony, standing alone, can be sufficient to support a defendant's conviction. *See* Tex. Code Crim. Proc. art. 38.07 (a conviction for sexual assault is supportable on the uncorroborated testimony of the victim if the victim informed any person, other than the defendant, of the offense within a year); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978) (holding victim's testimony of penetration by appellant, standing alone, was sufficient); *Jensen v. State*, 66 S.W.3d 528, 534 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (stating testimony of victim, standing alone, was sufficient). The State has no burden to produce physical or other corroborating evidence, and the jury determines the credibility of the witnesses and may "believe all, some, or none of the testimony." *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

The complainant informed others the day of her sexual assault, as testified to by Lovings's neighbor, Dr. McCarthy, and Officer Yzquierdo. The complainant's testimony, standing alone, was thus legally sufficient to support Lovings's conviction without corroborating evidence. We therefore reject Lovings's contention that the lack of evidence of vaginal or anal trauma renders the complainant's testimony suspect or legally insufficient. *See* Tex. Code Crim. Proc. art. 38.07; *Garcia*, 563 S.W.2d at 928; *Jensen*, 66 S.W.3d at 534.

Lovings's other purported conflicts in the evidence fare no better, as the jury was entitled to determine the significance, if any, of the alleged stab wound on his shoulder and the effect of the complainant's drug use on her memory. A rational jury could conclude that it may be normal for a sexual assault victim to remember what happened, yet be unable to recall every detail, and not attribute it to drug use. The jury also could have concluded that whether the complainant removed her clothing herself, or had access to mace, were not determinative factors when deciding whether or not she consented to

11

sex. Ultimately, the jury was free to believe the complainant's testimony that she did not consent to sex and to disbelieve Lovings's version of events. *See Gear*, 340 S.W.3d at 746; *Chambers*, 805 S.W.2d at 461.

Moreover, the jury's verdict is supported by other evidence in addition to the complainant's testimony. Lovings's neighbor testified that she remembered seeing a woman running away from Lovings who said she had been raped. The police dispatched to Lovings's house found blood stains on the floor, bloody rags or towels, the broken knife, and a pair of panties. Yzquierdo testified that the complainant did not appear intoxicated or high on drugs when he interviewed her. And Dr. McCarthy, Yzquierdo, and other emergency and hospital services personnel all documented the complainant's injuries and emotional distress.

Viewing the evidence in the light most favorable to the verdict, a rational fact finder could have found that the complainant did not consent and that Lovings committed the offenses of sexual assault beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318–19; *Gear,* 340 S.W.3d at 746. We overrule Lovings's second issue.

## III

In his first issue, Lovings contends the trial court abused its discretion by failing to include in the charge the statutory bases under which the jury could find the element of lack of consent and thereby caused him egregious harm. Lovings points out that neither the general instructions nor the application paragraphs included the applicable statutory definitions of "without consent" for either aggravated sexual assault or the lesser-included offense of sexual assault.

### A

An appellate court's first duty in analyzing a jury charge issue is to decide whether error exists. *Ngo v. State,* 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error is found, the degree of harm necessary for reversal depends on whether the appellant preserved the error by objecting to the complained-of instruction. *Olivas v. State,* 202 S.W.3d 137, 144 (Tex. Crim. App. 2006); *see Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App.

1985) (op. on reh'g). If the defendant properly objected to the erroneous jury charge instruction, reversal is required if we find "some harm" to the defendant's rights. *Olivas,* 202 S.W.3d at 144; *Ngo,* 175 S.W.3d at 743; *Almanza,* 686 S.W.2d at 171. But if the defendant did not object, we may only reverse if the record shows egregious harm to the defendant. *Olivas*, 202 S.W.3d at 144; *Ngo*, 175 S.W.3d at 743–44; *Almanza*, 686 S.W.2d at 171.

Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011). In making our determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza,* 686 S.W.2d at 171; *see Garrett v. State,* 159 S.W.3d 717, 719–21 (Tex. App.—Fort Worth 2005), *aff'd,* 220 S.W.3d 926 (Tex. Crim. App. 2007). Jury-charge error causes egregious harm to the defendant if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Hutch v. State,* 922 S.W.2d 166, 171 (Tex. Crim. App. 1996); *Almanza*, 686 S.W.2d at 172.

B

It is undisputed that Lovings's counsel did not object to the jury charge on the grounds that the trial court did not include the applicable statutory definitions of "without consent." Therefore, Lovings must show that the trial court erred by failing to include these definitions and that the trial court's error caused him egregious harm. *Olivas*, 202 S.W.3d at 144; *Ngo*, 175 S.W.3d at 743–44; *Almanza*, 686 S.W.2d at 171.

The trial court must charge the jury on the "law applicable to the case," which requires that the jury be instructed on each element of the offense or offenses charged. Tex. Code Crim. Proc. art. 36.14. The "law applicable to the case" also includes the statutory definitions that affect the meaning of the elements of the offense. *Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011); *Villarreal v. State*, 286 S.W.3d 321,

329 (Tex. Crim. App. 2009). Thus, a trial court is obliged to communicate to the jury each statutory definition that affects the meaning of an element of the offense. *Villareal*, 286 S.W.3d at 329.

The State appears to concede that the trial court erred in failing to instruct the jury on the applicable definitions of "without consent" because it does not argue that no error occurred. Instead, the State argues that even if the trial court erred, the absence of the statutory definitions did not cause egregious harm to Lovings. Therefore, we will presume the trial court erred and determine whether the trial court's error caused Lovings egregious harm.

The charge reflects that the trial court properly instructed the jury in both the abstract and the application paragraphs that to convict Lovings of the offense it must find the sexual assault was "without consent."[3] The abstract portion of the charge read as follows: "A person commits the offense of sexual assault if the person intentionally or knowingly causes the penetration of the [female sexual organ or anus] of another person by any means, without that person's consent." Similarly, the application paragraph of the charge instructed the jury that if it found from the evidence beyond a reasonable doubt that Lovings "intentionally or knowingly caused the penetration of the [female sexual organ or anus] of [the complainant], by placing his sexual organ in the [female sexual organ or anus] of [the complainant], without the consent of [the complainant], then you will find the defendant guilty of sexual assault." Even though "without consent" was not defined, the charge included all of the elements of the offense and consequently was not fundamentally defective. *See Rohlfing v. State*, 612 S.W.2d 598, 602–03 (Tex. Crim. App. [Panel Op.] 1981) (failure to define statutory element was harmless error because element was not omitted from charge and charge did not authorize conviction without finding all elements of the offense).

Our courts have held that when a statutory definition is not included in the jury charge, "it is assumed the jury would consider the commonly understood meaning in its

---

[3] Because the two charges are identical except for the way in which the sexual assaults were committed, we will discuss them as one charge.

14

deliberations." *Olveda v. State,* 650 S.W.2d 408, 409 (Tex. Crim. App. 1983); *Nejnaoui v. State,* 44 S.W.3d 111, 120 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). On the facts of this case, the commonly understood meaning of "without consent" closely resembles the applicable statutory definitions and would not have confused the jury or caused the jury to misapply the law.

The relevant statutory definitions of "without consent" are (1) "the actor compels the other person to submit or participate by the use of physical force or violence," and (2) "the actor compels the other person to submit or participate by threatening to use force or violence against the other person, and the other person believes that the actor has the present ability to execute the threat." Tex. Penal Code § 22.01l(b)(1), (2). The dictionary defines "consent" as "permission, approval, or assent" and gives the example, "to willingly engage in a sexual act." WEBSTER'S NEW WORLD COLLEGE DICTIONARY 310 (4th ed. 2001). Thus, engaging in a sexual act "without consent" would be commonly understood to mean doing so unwillingly. Because the statutory definitions of the phrase "without consent" describe compelling an unwilling person to engage in sexual acts, the statutory definition was not necessary to correct or complete the jury's understanding of the concepts or terms in the application part of the charge. *See Nejnaoui,* 44 S.W.3d at 120.

As discussed above in greater detail, the complainant testified that Lovings committed sexual assault by overpowering her with threats and the use of physical force or violence. Conversely, Lovings maintained the sexual acts were consensual. The prosecutor argued that consent was the only disputed element and it hinged on whether the jury believed the complainant was telling the truth. Defense counsel responded that the complainant was not credible and suggested it was more likely that she was trading sex for drugs that night. The issue for the jury was which version of events to believe. On the facts of this case, the inclusion of the statutory definitions of "without consent" would not have assisted the jury in resolving any issues regarding the complainant's credibility because she testified to the same conduct described in the statutory definitions.

15

Therefore, Lovings has not shown that the trial court's error, if any, was so egregious that he did not receive a fair and impartial trial. *See Rohlfing*, 612 S.W.2d at 602–03; *Nejnaoui*, 44 S.W.3d at 120. We overrule Lovings's first issue.

\* \* \*

Having overruled Lovings's issues, we affirm the trial court's judgment.


/s/      Jeffrey V. Brown
         Justice


Panel consists of Chief Justice Hedges and Justices Seymore and Brown.

Publish — TEX. R. APP. P. 47.2(b).