**MODIFY and AFFIRM; Opinion Filed March 19, 2014.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01443-CR

### MELVIN JERMAIN JOHNSON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause No. F-11-60284-X**

## MEMORANDUM OPINION
Before Justices O'Neill, Myers, and Brown
Opinion by Justice Brown

A jury convicted Melvin Jermain Johnson of aggravated sexual assault and assessed punishment, enhanced by a prior conviction, at sixty years in prison and a $7,500 fine. In two points of error, he challenges the sufficiency of the evidence to support his conviction and the trial court's denial of his requested jury instruction on the lesser included offense of sexual assault. We modify the trial court's judgment to correctly reflect appellant's plea of true and the jury's finding of true to the State's enhancement allegation and affirm the judgment as modified.

### Background

Appellant was charged by indictment with the offense of aggravated sexual assault while using or exhibiting a deadly weapon, a firearm. *See* TEX. PENAL CODE ANN. §

22.021(a)(1)(A)(i)–(ii), (a)(2)(A)(iv) (West Supp. 2013). Appellant pleaded not guilty to the charge, and the case was tried to a jury.

The complainant is an adult female, who in September of 2011, was selling her body for sex as a way to earn money. To solicit business, she placed an ad on a chat line that said "pay to play." The complainant met appellant through the chat line. She testified that around 12:30 in the afternoon on September 17, 2011, she had a conversation with appellant through the chat line during which she gave him her cell phone number. She then exchanged text messages with appellant about meeting. They also discussed appellant's request for a "private dance" with appellant telling the complainant that "his wallet was open." They agreed to meet around seven or eight o'clock in the evening at her apartment.

After appellant arrived, he asked for a tour of her apartment as they had discussed in the text messages. The complainant explained appellant wanted to make sure "he wasn't being set up." When they eventually settled in her living room, appellant asked the complainant if she was going to dance. The complainant turned on some music and began dancing. As she was dancing, appellant instructed her to get on the floor and dance with her back to him, which she did. The complainant testified that she was bending down and when she stood up, she felt appellant's arm around her neck and "something" against her ear. She said appellant told her to "shut up" and that he would "blow [her] brains out" if she said something. The complainant complied but was crying.

Appellant asked the complainant for another tour of her apartment during which he kept his arm around her neck and the gun to her ear. After the tour, appellant made the complainant sit down on one of her couches and asked her a "bunch of questions" about whether she worked for a pimp. She said he had the gun pointed at her while asking the questions. Appellant also asked the complainant about the location of her money. The complainant first insisted that she

–2–

did not have any money. But she recalled telling appellant that she had seen someone else earlier in the day and "had already made some money" so she gave him her wallet. She told him that was all the money she had and to take it and go. She said appellant was mad at her for lying.

Appellant then grabbed the complainant's cell phone and looked through her messages and pictures. He found a picture of her in a black dress and told her to put it on. Appellant accompanied her to the bedroom where she changed into the dress and took her back to the living room where she sat on the couch. The complainant testified she saw the gun the whole time. Appellant pointed the gun at the complainant and ordered her to "play with herself." As she complied, he walked over to her, pulled down her bra strap, and touched her breast.

The complainant testified that appellant made her get up and go into the bedroom. He pushed her face down on the bed. She recounted that she told him "no" but that appellant made her believe that if she resisted, he had a team waiting outside to join him. She testified that she was scared. Appellant got a condom from his pocket, bent her over, and "went inside" of the complainant's vagina with the condom on. He then stopped, took the condom off, removed his clothes, laid down on the bed, and forced the complainant to perform oral sex. The complainant testified that while she gave appellant oral sex, the gun was to her head.

The complainant said appellant made her get on top of him, and they had sex. She said she "did what he told [her] to do." During sex, appellant put the gun to her side. Appellant then positioned himself on top of the complainant, laid back down, and forced her to perform oral sex a second time. Appellant held her head down while he ejaculated in her mouth and demanded that she "swallow it," which she did.

Appellant put his clothes back on, took the complainant back to the living room, and began going through her wallet. He pulled out her money, ID, and various cards, including her child support and food stamps cards. He called the numbers on the cards to find out how much

money was available in the accounts and demanded the PIN numbers for each card. He threatened to come back and kill the complainant if she gave him the wrong PIN numbers. Appellant also went from room to room looking for valuables. When they got to the kitchen, appellant said he was "going shopping" and had the complainant package up her food like groceries. He found a bottle of vodka and instructed the complainant to take a shot "to wash the nut down," referring to when he ejaculated in her mouth.

The complainant testified appellant then took her back to the bedroom. He told her to "put [her] arms together," and he bound her wrists with duct tape he pulled from his pocket. He did the same thing to her ankles. She had to help appellant tape her up because appellant had the gun in one hand. After appellant taped her wrists and ankles, he told the complainant he wanted more oral sex and threatened to shoot her if she did not do it. He removed the tape from her wrists so she "could get a better angle" and again ejaculated in her mouth. Although he told her to swallow it, the complainant spit it in a towel that was on her bed. After she spit in the towel, appellant taped her wrists again.

Appellant left the complainant in the bedroom, and she heard him rummaging through her apartment. The complainant testified that before appellant left her apartment, he came back into the bedroom and told her he did not care if she told anyone about what had happened because she was "nothing" and "just a ho." He also told her the police would not do anything to help her, which is why he let her see his face. Appellant said even though he does not look like the type of person that would "do this," he was a "monster" and warned the complainant not to mess with him. He got in the complainant's face and slapped her.

After she was certain appellant had left, the complainant loosened the duct tape with her mouth and cut the tape off her ankles when she got her hands free. She ran to her next-door neighbor's apartment, and the police were called. The complainant recounted that she was

"pretty upset" when she reached her neighbor's apartment. Her neighbor similarly testified that the complainant was crying and hysterical, and while they waited for the police, he tried to calm her down. The neighbor also saw some residue on her wrists and ankles and said he could tell she had been tied up.

When the police arrived, the complainant took them to her apartment to show where the sexual assaults took place. And she was later transferred to the hospital for a sexual assault examination. A week later, the complainant was asked to view a photo lineup during which she identified appellant as the man who sexually assaulted her at gunpoint. The detective who administered the lineup testified that when the complainant saw the photo, she paused and started crying. She said she recognized his eyes and that she was "more than 100% sure" about the identification. She also identified appellant in court.

The complainant testified appellant had been at her apartment for four hours. She said that during that time, she never screamed or pounded the walls because appellant had told her that he would kill her if she was not quiet. She admitted on cross examination that appellant was not the only person she communicated with that day. She had phone conversations and exchanged text messages with different individuals throughout the day.

Courtney Ferreira, a forensic biologist, testified to the results of the DNA analyses she performed for this case. She specifically analyzed DNA collected during the sexual assault examination and from items in the complainant's apartment, including the towel and duct tape. Ferreira testified that although she detected male DNA on the vaginal swab, oral rinse swab from the complainant's mouth, and swab of her neck, appellant was excluded as being a possible contributor of that DNA. The DNA profile obtained from the towel matched appellant's DNA profile. Appellant's genetic markers also were observed on some of the duct tape samples.

The jury also heard testimony from the crime scene analyst who took photographs of and collected evidence from the complainant's apartment. She testified she dusted the apartment for fingerprints but there were "no hits." The physician, who performed the sexual assault examination, testified she saw no injuries on the complainant's body. The physician explained the information she put in her report was based on what the complainant told her. She acknowledged that if the information provided was inaccurate, it could skew some of the results from the evidence collected. For example, the physician documented that the complainant told her the last time she had sexual intercourse was two days before. But the complainant testified she had told appellant that she had been with someone else earlier that day. The complainant did not describe what, if anything, occurred with the other person.

Appellant denied sexually assaulting the complainant. He also testified he never "pull[ed] a gun" on the complainant or verbally threatened her. Nor did he use duct tape on her wrists or ankles. He recounted a different story from that of the complainant and said the sexual contact with the complainant was consensual. Appellant testified that when he arrived at the complainant's apartment, they "discussed what all was going to take place" and that he preferred for her to dance for him. He said that while she was dancing, he tipped her. And after she had danced for fifteen or twenty minutes, she "seductively crawled" over to him and "proceeded to give [him] oral sex," which he accepted. He said after he ejaculated in her mouth, they decided to go to her bedroom "to partake in sex." According to appellant, it was the complainant's idea for him not to wear a condom during sex and while they were having sex, they agreed that before he ejaculated a second time, they would reposition so he could ejaculate in her mouth, which she spit out into a nearby towel. Appellant testified that he then took a shower, and they watched a "comedy movie" for about an hour. They later went back into the bedroom where they fell asleep. He left while she was sleeping and drove off in his girlfriend's car.

–6–

Appellant admitted that he was not cooperative when he was later interviewed by the police. He specifically denied any knowledge of the chat line and being at the complainant's apartment. He told the detective he had not left his house or been with any girl that day. He also had no idea why someone would pick him out of a lineup.

The jury found appellant guilty of aggravated sexual assault as charged in the indictment. After a punishment hearing during which appellant pleaded true to the State's enhancement allegation, the jury assessed punishment at sixty years in prison and a $7,500 fine. The jury also found the enhancement allegation to be true.

## Sufficiency of the Evidence

Appellant contends in his first point of error that the evidence is insufficient to support his conviction for aggravated sexual assault. Specifically, he argues the evidence shows that he and the complainant "agreed to meet for a price and engage in sexual favors" and that their "sexual episodes were consensual." He also argues there was no evidence of a gun other than the complainant's testimony because no gun was found or introduced into evidence at trial. He claims the complainant was not reliable or trustworthy, and her testimony was in conflict with the DNA testing, which excluded him as being a contributor of DNA to the vaginal, oral, and neck swabs taken from the complainant.

### *Legal Standards & Applicable Law*

In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This standard recognizes the responsibility of the fact finder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."

*Jackson*, 443 U.S. at 319. We defer to the fact finder's credibility and weight determinations because the trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See id.* at 326.

The jury found appellant guilty of aggravated sexual assault with a deadly weapon, a firearm. To prove beyond a reasonable doubt appellant committed the offense as charged in this case, the State had to establish appellant intentionally or knowingly caused the penetration of the complainant's sexual organ and mouth with his sexual organ without the complainant's consent and used or exhibited a deadly weapon in the course of the act. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(i)–(ii), (a)(2)(A)(iv). A sexual assault is without consent if, among other things, "the actor compels the other person to submit or participate by threatening to use force or violence against the other person, and the other person believes that the actor has the present ability to execute the threat." *Id.* § 22.011(b)(2) (West 2011).

The State could meet its burden through the uncorroborated testimony of the victim if she informed any person, other than the defendant, of the alleged offense within one year of the attack. TEX. CODE CRIM. PROC. ANN. art. 38.07(a) (West Supp. 2013); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978) (victim's testimony of penetration was sufficient to support conviction); *Sims v. State*, 84 S.W.3d 768, 774 (Tex. App.—Dallas 2002, pet. ref'd); *Quincy v. State*, 304 S.W.3d 489, 497 (Tex. App.—Amarillo 2009, no pet.). In addition, testimony by a complainant that the defendant possessed a gun and threatened to use it if she failed to comply with his demands was sufficient to show a deadly weapon was used or exhibited in the course of the criminal episode. *Yates v. State*, 370 S.W.3d 772, 774 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Gaudette v. State*, 713 S.W.2d 206, 209 (Tex. App.—Tyler 1986, pet. ref'd)).

*Analysis*

The complainant testified in detail as to what happened to her during those four hours in her apartment. This testimony alone was sufficient to support appellant's conviction in this case. *See Sims*, 84 S.W.3d at 774. The complainant specifically testified that appellant penetrated her vagina and mouth with his penis several times without her consent while holding a gun to her head and side. She also testified she saw the gun the whole time, appellant threatened to "blow [her] brains out" if she was not quiet, and because she was scared, she did what appellant asked. *See Yates*, 370 S.W.3d at 774. She further said appellant took her money, food, and other valuables, insulted her, slapped her in the face, and bound her wrists and ankles with duct tape. She sought help from her neighbor as soon as appellant left her apartment, and her neighbor called the police.

Appellant's arguments that the DNA test results support his testimony (not the complainant's testimony) and show that the complainant had "an encounter with someone else who was the culprit" are unavailing. The complainant admitted she sold her body for money and that she had been with someone else earlier in the day, so the presence of another man's DNA does not negate the complainant's testimony that appellant was the person that sexually assaulted her at gunpoint. In addition, the State "has no burden to produce physical or other corroborating evidence"—the complainant's testimony alone was sufficient— and "the jury determines the credibility of the witnesses and may 'believe all, some, or none of the testimony.'" *Lovings v. State*, 376 S.W.3d 328, 336 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (quoting *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)); *see also Jackson*, 443 U.S. at 319 (stating it is trier of fact's role to reconcile conflicts in testimony and weigh evidence). By its verdict, the jury chose to believe the complainant, and we are prohibited from substituting our

own perceptions of the evidence for those of the jury. *See Jackson*, 443 U.S. at 326 (reviewing court must defer to trier of fact's determinations regarding conflicts in evidence).

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found the essential elements of the offense as charged, in particular, that the sexual encounter with appellant was without the complainant's consent and that appellant used or exhibited a gun in the course of the sexual encounter. We therefore conclude the evidence is legally sufficient to support appellant's conviction for aggravated sexual assault. We overrule appellant's first point of error.

### Lesser Included Offense Instruction

In his second point of error, appellant challenges the trial court's denial of his request for a jury instruction on the lesser included offense of sexual assault. *See* TEX. PENAL CODE ANN. § 22.011(a). A defendant is entitled to an instruction on a lesser included offense when (1) the lesser included offense is included within the proof necessary to establish the charged offense and (2) there is some evidence in the record that if the defendant is guilty, he is guilty only of the lesser included offense. *See Young v. State*, 283 S.W.3d 854, 875 (Tex. Crim. App. 2009) (per curiam), *cert. denied*, 558 U.S. 1093 (2009); *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007). Because the State agrees sexual assault is a lesser included offense of aggravated sexual assault, our focus is whether some evidence in the record would permit the jury to find that if appellant is guilty, he is guilty only of sexual assault. *See Hall*, 225 S.W.3d at 536; *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994).

Sexual assault is elevated to aggravated sexual assault if one of the aggravating elements is also proved. *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(A); *Jackson v. State*, 968 S.W.2d 495, 500 (Tex. App.—Texarkana 1998, pet. ref'd). The aggravating element at issue in this case is whether appellant used or exhibited a deadly weapon, a gun, in the course of the criminal

episode. TEX. PENAL CODE ANN. § 22.021(a)(2)(A)(iv). Thus, for appellant to be entitled to a charge on the lesser included offense of sexual assault, there must be some evidence that if he was guilty of any offense, it was only sexual assault without the aggravating factor. *Jackson*, 968 S.W.2d at 500–01. To make this determination, we must consider all evidence introduced at trial. *See Young*, 283 S.W.3d at 875. "Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge." *Bignall*, 887 S.W.2d at 23. In addition, if there is evidence from any source raising the issue that the defendant committed a lesser included offense and the defendant requested the issue, the trial court must submit the issue to the jury. *See Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993). The evidence must establish the lesser included offense as a valid and rational alternative to the charged offense. *Hall*, 225 S.W.3d at 536.

Appellant argues he was entitled to an instruction on the lesser included offense of sexual assault because of his testimony that "he did not exhibit or use a gun" during his encounter with the complainant. He maintains that other than the complainant's testimony, there is "no real evidence that a weapon was used or exhibited" and claims that a rational trier of fact, if afforded the opportunity, could have found that if he was guilty, he was guilty only of the lesser offense of sexual assault. We disagree.

Although appellant testified he did not "pull a gun" on the complainant, he also testified that the sexual contact that occurred between him and the complainant was consensual. Thus, if the jury believed his testimony, appellant would be guilty of no offense, not the lesser included offense of sexual assault. In contrast, the complainant testified that appellant sexually assaulted her while using or exhibiting a gun. "If the evidence proves that the defendant is either guilty of aggravated sexual assault or completely innocent, then the trial court should not give a charge on a lesser included offense." *Jackson*, 968 S.W.2d at 501 (citing *Bravo v. State*, 627 S.W.2d 152,

–11–

157 (Tex. Crim. App. 1982)). Based on our review of the evidence presented at trial and by appellant's own testimony, appellant was either guilty of aggravated sexual assault or guilty of no offense at all. We therefore conclude the trial court properly refused to charge the jury on the lesser included offense of sexual assault. We overrule appellant's second point of error.

## Modification of the Judgment

Although neither appellant nor the State raises this issue, we observe that the trial court's written judgment omits appellant's plea of true and the jury's finding of true to the State's enhancement allegation. The record shows the State sought to enhance appellant's punishment range with a prior conviction for aggravated assault. At the start of the punishment hearing, the State read the enhancement paragraph to which appellant pleaded true, and the court's charge to the jury on punishment also states that appellant pleaded true to the enhancement paragraph. The jury found the allegation set out in the enhancement paragraph to be true. The judgment incorrectly states "N/A" under the spaces provided for "Plea to 1st Enhancement Paragraph" and "Findings on 1st Enhancement Paragraph."

This Court has the authority to correct a trial court's judgment and affirm it as modified. TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Such authority is not dependent upon the request of any party, nor does it turn on the question of whether a party has objected in the trial court. *Asberry*, 813 S.W.2d at 529–30. We therefore modify the judgment in this case to reflect that appellant entered a plea of true to the enhancement paragraph and that the enhancement paragraph was found to be true.

We affirm the trial court's judgment as modified.

/Ada Brown/
_____
ADA BROWN
JUSTICE

Do Not Publish
Tex. R. App. P. 47

121443F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MELVIN JERMAIN JOHNSON, Appellant

No. 05-12-01443-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas
Trial Court Cause No. F-11-60284-X.
Opinion delivered by Justice Brown.
Justices O'Neill and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

The "Plea to 1st Enhancement Paragraph" is modified to read: "TRUE."

The "Findings on 1st Enhancement Paragraph" is modified to read: "TRUE."

As modified, the trial court's judgment is **AFFIRMED**.

Judgment entered this 19th day of March, 2014.

/Ada Brown/
ADA BROWN
JUSTICE

–14–