**Affirmed and Opinion filed October 31, 2013.**



**In The**

# Fourteenth Court of Appeals

---

### NO. 14-12-00054-CR

---

**TRENT MASON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court
Harris County, Texas
Trial Court Cause No. 1203977**

---

## O P I N I O N

In six issues, appellant Trent Mason appeals his conviction for capital murder, complaining of insufficient evidence to sustain his conviction, violation of his right to confront and cross-examine witnesses, errors during the State's closing argument, admission of improperly suggestive photo spread identifications, erroneous admission of extraneous offense evidence, and jury charge error. We affirm.

## Background

Shortly after midnight on January 9, 2009, Randi Johnson returned home from work to his apartment in Humble, Texas. At about 1:00 a.m., Johnson heard a noise on his balcony, looked out, and saw a man wearing a red shirt and dark hat, whom Johnson later identified—both in a pretrial photo lineup and in court—as appellant. Someone then kicked in Johnson's front door, and Johnson testified at trial that appellant and two other men entered the apartment. According to Johnson, appellant had a ".38 snubnose" revolver and yelled at Johnson to "get facedown." Johnson testified that appellant and the two other men then robbed him at gunpoint. Johnson jumped off the second floor balcony of his apartment. During his escape, he was shot in the leg.

Johnson's neighbor, Joel Mitchell, was in his own apartment when he heard two or three gunshots and "peek[ed]" outside of his sliding glass door. Mitchell saw three men running toward what Mitchell described as a Ford Ranger with "faded kind of greenish paint."[1] The men saw Mitchell, and one of them fired at him. The bullet shattered the sliding glass door. Another neighbor, Deidra Mack, heard gunshots and Johnson's door being kicked in. She saw two assailants fleeing who fired shots at her. She testified one assailant was wearing a red shirt and both were wearing hats—one was wearing a black hat, but she could not say which. The two assailants got into a truck with a third person who was the driver.

Approximately eight minutes later, Norma Cruz-Ordonez, her husband, and her cousins returned to their apartment, which was approximately one block away from Johnson's apartment, after picking Norma up from work. At the time, Norma lived in the apartment with her husband, four cousins, three brothers, and two

---

[1] A stolen blue Ford Ranger was recovered later from the parking lot at 412 Bender Street where the offense for which appellant was convicted occurred.

2

children. Shortly after Norma and her family entered their apartment, an armed man kicked open their door. Norma identified the man as wearing a red shirt and a black cap. She "g[ot] a good look at his face." The man immediately pointed a gun at her, and two more men entered the apartment.[2] They yelled at Norma and her husband to lie down on the ground and hand over their wallets. One of them tried to shoot Norma's brother, Alberto, but the gun would not discharge, so he hit Alberto in the face with the butt of the gun. Alberto did not see his assailant's face, but testified the assailant was wearing a white shirt.

Norma's other brother Mauricio, who had been upstairs, heard the yelling and came downstairs. As he was walking down the stairs, he was shot and killed. Two shots were fired. At trial, Norma identified appellant as the man in the red shirt who killed Mauricio. Alberto testified that the person who shot at Mauricio the second time was wearing a red shirt, but Alberto did not see who fired the first shot. Meanwhile, Norma's third brother, Javier, ran down the stairs behind Mauricio, and the man in the red shirt shot Javier in the shoulder. Alberto could not identify any of the assailants.

Norma's husband, Eliseo Mendiete, also testified. In both a pretrial photo lineup and in court, Mendiete identified appellant as the man who entered his home while wearing a red shirt and a black "handkerchief or rag" on his head. Mendiete also testified that this man shot and killed Mauricio. Mendiete further identified appellant's cousin, Jeremy Wright, as a participant in the robbery.[3]

Almost an hour after these crimes occurred, a surveillance camera at a Jack In The Box fast food restaurant recorded a gold Chrysler Concorde at the drive-

---

[2] There is conflicting evidence in the record as to whether the third man entered the apartment or stayed outside as the "lookout." Norma testified the third man looked younger than the others.

[3] The man wearing the white shirt matched Wright's description.

through. On the video, three people are in the vehicle. Appellant is driving, wearing a red shirt, and a woman is in the front passenger seat. One passenger can be seen in the backseat, but it is unclear whether there are other occupants in the vehicle.[4] The vehicle was registered to Wright's girlfriend, Jessica Winn. In the video, the backseat passenger, who is wearing a white shirt, opens the car door and places a cell phone on the ground. The cell phone had been stolen from Johnson's apartment.[5] Winn told an officer she thought the backseat passenger was a person named "Marquis."[6] Winn also identified the female passenger as Toni McClure, appellant's girlfriend. Appellant later testified that one backseat passenger was Joshua Manning.

Winn consented to a search of her vehicle.[7] When officers arrived at its location, Manning was there. He immediately told an officer, "I didn't kill anybody." Manning confessed that he was involved in the two robberies. He told an officer that his role at Johnson's apartment was to retrieve items from the apartment and his role at Mauricio's apartment was to stand by the door and be the "lookout." Fingerprints on the Concorde matched Appellant's and Wright's, and appellant's DNA could not be excluded from gloves found inside the vehicle.[8]

Appellant sometimes stayed with Wright and their uncle. The murder weapon was found in a room in their uncle's home. Appellant, Wright, and

---

[4] An employee from Jack In The Box testified that there were four people in the vehicle: a male driver and female front seat passenger and two male backseat passengers.

[5] Another patron of Jack In The Box picked the cell phone up and gave it to the employee who was working the drive-through. He took the phone home, intending to return it to the owner. Officers later recovered the phone from the Jack In The Box employee.

[6] Police investigated two possible suspects named "Marquis," but eliminated them as suspects.

[7] Winn was in jail when officers contacted her to obtain permission to search the car.

[8] The gloves contained a mixture of DNA from three or more people. Neither Wright's nor appellant's DNA could be excluded from those test results.

4

Manning were arrested.

Appellant testified in his defense to another version of events—that he and McClure were staying at a duplex owned by appellant's cousin, Calvin Beasley, when Wright drove to the duplex in Winn's Concorde. Manning and "Marquis"[9] also pulled up in a stolen truck. Appellant asked Wright to take him and McClure to get something to eat. Wright assented and asked appellant to drive the Concorde. Appellant followed Manning and Marquis, who were planning to abandon the stolen truck. After they arrived at an apartment complex, Wright got out of the car and into the truck. Ten to fifteen minutes after the truck drove off, appellant heard two shots and saw Wright and Manning running toward him, yelling, "Let's go!" They got into the car, and as appellant was driving away, he saw guns in the backseat next to Wright, who was counting money. Wright told appellant, "I believe I shot somebody." Appellant drove straight back to Beasley's house. After they arrived at the house, McClure said she still was hungry, so she and appellant went with Wright and Manning to Jack In The Box.

After trial and several days of deliberations, a jury found appellant guilty of capital murder, and the trial court sentenced him to life imprisonment without parole.

### Discussion

In six issues, appellant challenges the sufficiency of the evidence to sustain his conviction and complains of a violation of his right to confront and cross-examine witnesses, error during the State's closing argument, admission of improperly suggestive photo spread identifications, erroneous admission of extraneous offenses, and jury charge error. We affirm.

---

[9] Appellant did not know Marquis' last name.

## I.   Evidence Legally Sufficient to Support Conviction

In his first issue, appellant challenges the legal and factual sufficiency of the evidence supporting his conviction. We apply only one standard to evaluate whether the evidence is sufficient to support a criminal conviction beyond a reasonable doubt: legal sufficiency.[10] *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see also Haggerty v. State*, 14-12-00461-CR, 2013 WL 3477571, at *2 (Tex. App.—Houston [14th Dist.] July 11, 2013, no. pet.). Therefore, when reviewing the sufficiency of the evidence, this Court considers all of the evidence in the light most favorable to the jury's verdict to determine, based on that evidence and the reasonable inferences therefrom, if a jury was rationally justified in finding guilt beyond a reasonable doubt. *Temple*, 390 S.W.3d at 360 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). Although we consider everything presented at trial, we do not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Williams v. State*,

---

[10] Appellant asserts a court of appeals' refusal to review the factual sufficiency of the evidence violates the Texas Constitution. *See* Tex. Const. art. V, § 6 ("[T]he decision of [Texas Courts of Appeal] shall be conclusive on all questions of fact brought before them on appeal or error."); *see also Temple v. State*, 342 S.W.3d 572, 648 (Tex. App.—Houston [14th Dist.] 2010) (Seymore, J., dissenting to denial of en banc rehearing), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013). Although the Texas Constitution makes intermediate appellate courts' factual sufficiency determinations "final and conclusive" on the Court of Criminal Appeals, it does not prohibit the Court of Criminal Appeals from deciding the proper application of the standard of review. *Temple*, 342 S.W.3d at 626-27 (Brown, J., concurring to the denial of en banc rehearing). When the Court of Criminal Appeals has deliberately and unequivocally interpreted the law in a criminal matter, we must adhere to its interpretation under the dictates of vertical stare decisis. *Id*. at 628; *see also Green v. State*, 350 S.W.3d 617, 629 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (Frost, J., concurring) ("Even if the justices of this court were to construe article V, section 6 of the Texas Constitution to provide for a separate factual-sufficiency review of [criminal convictions] by the courts of appeals . . . the Texas Constitution provides that the Court of Criminal [Appeals'] construction of article V, section 6 is final and binding upon this court in all criminal appeals." (citing Tex. Const. art. V, § 5(a) ("[T]he Court of Criminal Appeals shall have final appellate jurisdiction coextensive with the limits of the state, and its determinations shall be final, in all criminal cases."))). We thus are bound to follow the Court of Criminal Appeals' articulation of the standard of review set forth in *Temple*. *See* 390 S.W.3d at 360.

235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The jury is the sole judge of credibility and weight attached to the testimony of witnesses. *Temple*, 390 S.W.3d at 360 (citing *Jackson*, 443 U.S. at 319). Our review includes both properly and improperly admitted evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We also consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Id*.

To prove capital murder under the circumstances of this case, the State was required to prove that appellant intentionally caused Mauricio's death in the course of committing robbery. Tex. Penal Code §§ 19.02(b), 19.03(a)(2). A person commits robbery if, while in the course of committing theft, he intentionally or knowingly threatens someone or places someone in fear of imminent bodily injury, or intentionally, knowingly, or recklessly causes bodily injury to someone. *Id*. § 29.02(a). The jury was instructed that it could find appellant guilty as a principal or under the law of parties. A person may be convicted as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. *Id*. § 7.01(a). As relevant under these circumstances, a person is criminally responsible for the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id*. § 7.02(a). When the court's charge authorizes the jury to convict on several different theories, as here, the verdict must be upheld if the evidence is sufficient as to any one of the theories. *See Martinez v. State*, 129 S.W.3d 101, 106 (Tex. Crim. App. 2004).

While appellant argues this is a case of mistaken identity, ample evidence supports the jury's verdict. Less than ten minutes before Mauricio was murdered, Johnson was shot and robbed in his apartment that was one block away from

Mauricio's. Johnson testified that appellant was carrying a ".38 snubnose," which was the type of weapon that killed Mauricio. Johnson identified appellant both in a pretrial photo lineup and later at trial as the man wearing a red shirt and dark hat who shot him. Johnson's neighbor, Mack, also identified one of Johnson's assailants as a male wearing a red shirt. She also testified one of the assailants was wearing a black hat, although she could not remember which one.

Norma described her brother's shooter as wearing a red shirt and black cap. She "g[ot] a good look at his face" and identified appellant at trial as the man who killed Mauricio. Alberto testified that the man he saw shoot at Mauricio was wearing a red shirt. Mendiete likewise identified Mauricio's shooter as wearing a red shirt and black "handkerchief or rag" on his head. Mendiete positively identified appellant as the shooter both in a pretrial photo lineup and in court. Although appellant's defense at trial was that the State's witnesses had mistaken him for Wright, Mendiete also positively identified Wright in a pretrial photo lineup as *another* participant in the robbery.[11]

Less than an hour after the shooting, appellant was videotaped at Jack In The Box wearing a red shirt and driving a car with an occupant who abandoned Johnson's stolen cell phone. Appellant admitted that he was the driver of the car. His DNA could not be excluded from gloves that were inside the car, and his fingerprints were on the car.

Appellant admitted that he was with Wright and Manning and a stolen truck at Johnson's apartment complex near where Norma's family was robbed and Mauricio was murdered. Mitchell's testimony describing the truck used as a "getaway" from Johnson's robbery resembled the vehicle that was found at

_____

[11] An officer testified that Mendiete positively identified Wright in a pretrial photo lineup.

Mauricio's apartment complex.[12] The murder weapon was recovered subsequently at the home of appellant's uncle, where appellant and Wright sometimes stayed.

Appellant argues the following facts show the evidence supporting his conviction is legally insufficient: there were discrepancies between the police report and witness testimony, Norma could not remember certain details about the shooter and his weapon, Alberto could not identify any of the assailants and was confused about certain details of the crime, appellant's boots were a larger size than the shoes obtained from the Concorde, and the only DNA evidence linked to appellant was found in the work gloves in the Concorde. However, any inconsistencies in the evidence, and specifically in the witnesses' identification of defendants, are matters to be weighed by the jury in its determination of guilt and innocence and do not alone render the evidence insufficient. *See Amador v. State*, 376 S.W.3d 339, 345 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd); *see also Kesaria v. State*, 148 S.W.3d 634, 641 (Tex. App.—Houston [14th Dist.] 2004) ("[A] decision is not manifestly unjust merely because the jury resolved conflicting views of the evidence in favor of the State."), *aff'd*, 189 S.W.3d 279 (Tex. Crim. App. 2006). Moreover, we give great weight to the fact that Norma and Mendiete both positively identified appellant as Mauricio's killer. *Cf. Kesaria*, 148 S.W.3d at 641 (noting positive identification by the victim of a crime is "to be given great weight").

Viewing the evidence in the light most favorable to the jury's verdict, we conclude the evidence is legally sufficient to support the jury's finding that

---

[12] Mitchell described the vehicle as a "greenish" Ford Ranger when it was actually blue. An officer testified it is not uncommon for witness statements to vary from the actual color of a vehicle involved in a crime, so Mitchell's statement that the truck was "greenish" was not surprising.

appellant committed capital murder. We overrule appellant's first issue.

## II. Admitting Custodial Statement Harmless and Excluding Statement to Inmate Not Error

In his second issue, appellant complains that the trial court abused its discretion in (1) allowing the State to elicit testimony from an officer regarding Manning's custodial statement about the robbery at Mauricio's apartment and (2) preventing appellant from eliciting Manning's statement to another inmate that Manning had shot a man. We address each issue in turn.

### A. Testimony Regarding Manning's Custodial Statement

An officer testified that when the search warrant was executed on the Concorde, which was located at a residential address, Manning was there. When the officer saw Manning, the officer said, "You're the kid from the video. I need to talk to you." Manning immediately volunteered, "I didn't kill anybody." Appellant's attorney did not object to this testimony.

The officer subsequently took Manning to the police station where he made a statement after his *Miranda* rights were administered to him by a judge.[13] Defense counsel objected to the admissibility of Manning's custodial statement on the grounds that it violated appellant's Sixth Amendment right to confront the witness and is hearsay. Defense counsel articulated his concern that Manning's claim that he was not the shooter would incriminate appellant.

The trial court allowed the State to elicit the following testimony regarding Manning's custodial statement over defense counsel's objection:

> [State:]  Did you ask [Manning] about his involvement in [robbing Johnson]?

---

[13] A judge was required to administer Manning's *Miranda* rights because he was a minor. *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966).

10

[Officer:]    Yes, ma'am.

[State:]    What did he say his involvement was . . . ?

[Officer:]    His job was to get items out of the apartment.

. . . .

[State:]    Did you ask him about his involvement at [Mauricio's apartment]?

[Officer:]    Yes, ma'am.

[State:]    And what did he say?

[Officer:]    He told me he was the lookout. He stood by the door.

On appeal, appellant argues that the trial court's admission of the officer's testimony with regard to Manning's custodial statement violated appellant's right under the Sixth Amendment of the United States Constitution to confront Manning and cross examine him regarding whether he was the shooter.[14]

Assuming without deciding that the officer's testimony regarding Manning's custodial statement was erroneously admitted, a violation of a defendant's right to confrontation is subject to harmless error analysis. *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007); *Wilson v. State*, 296 S.W.3d 140, 149 (Tex. App.— Houston [14th Dist.] 2009, pet. ref'd). Thus, even if the admission of the testimony were erroneous, we nevertheless will affirm the conviction if we determine beyond a reasonable doubt that the alleged error did not contribute to appellant's

---

[14] Under the Confrontation Clause made applicable to the states through the Fourteenth Amendment, "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013) (citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965)). In *Crawford v. Washington*, the Supreme Court interpreted this to mean that "testimonial" evidence is inadmissible at trial unless the witness who made the testimonial statement either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine him. *Id.* (citing *Crawford v. Washington*, 541 U.S. 36, 54 (2004)).

11

conviction. *Wilson*, 296 S.W.3d at 149; *see also* Tex. R. App. P. 44.2(a).

In determining whether the admission of the statement was harmless beyond a reasonable doubt, we consider: (1) the importance of the statement to the State's case; (2) whether the statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the statement on material points; and (4) the overall strength of the State's case. *Wilson*, 296 S.W.3d at 149. In addition to those factors, we also may consider the source and nature of the error, the extent of the State's emphasis on the evidence, and the relative weight the jury may have assigned to the evidence as compared with the balance of the remaining evidence relevant to the issue. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007); *Wilson*, 296 S.W.3d at 149. Finally, we consider any other factor contained in the record that might shed light on the probable impact of the evidence on the minds of average jurors. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007); *Wilson*, 296 S.W.3d at 149.

We are not simply to decide whether the jury verdict enjoyed evidentiary support. *See Scott*, 227 S.W.3d at 690; *see also Wilson*, 296 S.W.3d at 149. Instead, the question is whether the alleged constitutional error was actually a contributing factor in the jury's deliberations in arriving at a verdict. *Scott*, 227 S.W.3d at 690; *Wilson*, 296 S.W.3d at 149. Thus, Confrontation Clause error does not require reversal unless there is a reasonable possibility that, within the context of the entire trial, the perceived error "moved the jury from a state of non-persuasion to one of persuasion on a particular issue." *Scott*, 227 S.W.3d at 690; *Wilson*, 296 S.W.3d at 149.

After reviewing these considerations, we are persuaded beyond a reasonable doubt that the jury would have found appellant guilty of capital murder even if the trial court had not admitted the officer's testimony about Manning's custodial

12

statement. *See Clay*, 240 S.W.3d at 905; *see also Wilson*, 296 S.W.3d at 149.

**Not important to the State's case**. The statement—regarding Manning's removing items from Johnson's apartment and being the "lookout" in the robbery during which Mauricio was killed—was not particularly important to the State's case. The statement did not incriminate appellant because it did not place him at the crime scene—it merely supported an inference that Manning was not the shooter. The State did not focus on Manning's custodial statement during its closing argument or otherwise throughout the lengthy trial proceedings. *See Wilson*, 296 S.W.3d at 149. Instead, the State heavily emphasized the other witnesses' testimony identifying appellant as the shooter and the evidence linking appellant to both robberies, such as his presence in the car with Wright and Manning when Johnson's cell phone was abandoned. *See Clay*, 240 S.W.3d at 905; *see also Wilson*, 296 S.W.3d at 149.

**Corroborated by and cumulative of other evidence**. Manning's statements were corroborated by and cumulative of other evidence. First, the officer testified that Manning said, "I didn't kill anybody," and defense counsel did not object to that statement. Second, Norma and Mendiete both identified appellant as the shooter. Third, the numerous descriptions of the shooter in the red shirt and black head covering matched appellant's description. Fourth, Manning was the only party to the crime who was not identified by an eyewitness, which corroborates his story that he did not enter Mauricio's apartment.

**Strength of the State's case without the Statement**. Finally, as set forth above, overwhelming evidence regarding appellant's identity and participation in the robberies supported the jury's finding that appellant committed capital murder, whereas Manning's custodial statements established little, if anything, negative about appellant that was not also well established by the properly admitted

13

evidence. *See Clay*, 240 S.W.3d at 905-06; *see also Wilson*, 296 S.W.3d at 150. In *Clay*, the Court of Criminal Appeals stated:

> The State's case establishing appellant's guilt of aggravated robbery, either as a principal or as a party, was straightforward and strong—unshakeable eyewitnesses placing him in the vicinity of the crime and shortly thereafter at the scene of the crime itself, together with other circumstances strongly indicating his guilt—and leaves us firmly convinced that in the absence of the erroneously admitted testimony, a reasonable jury would not have found the State's case significantly less persuasive.

240 S.W.3d at 905. Similarly, here, the State presented a strong case establishing appellant's guilt, including eyewitness testimony placing him in the vicinity of the crime and at the scene of the crime, along with other circumstances strongly indicating his guilt. Accordingly, the record indicates the jury probably assigned very little weight, if any, to Mannings' custodial statement. *See Wilson*, 296 S.W.3d at 150.

After considering all of the harmless error factors, we find no reasonable probability that the trial court's alleged Confrontation Clause error "moved the jury from a state of non-persuasion to one of persuasion" on the issue of appellant's guilt. *See id*. at 149. We hold the admitted evidence was harmless. We turn to appellant's second complaint regarding whether the trial court erred in excluding evidence of Manning's statement that he shot a man.

**B. Testimony Regarding Manning's Statement that He Shot a Man**

Appellant also complains that the trial court excluded testimony from an inmate that Manning told the inmate he had chased down and shot a man. At trial, appellant proffered the following testimony from Jimmi Butler, who was housed in a cell next to Manning's:

- "[Manning] basically told me that—he said that he had killed

14

somebody and he signed [a plea bargain]. And the State wanted him to testify against his codefendant [appellant] that he did it. But he said that [appellant] didn't do it."

- "Joshua Manning told me that he had killed a Mexican. He told me he chased him down . . . [i]nside [a residence]."

- "He told me that the State believed that [appellant] had—had committed the murder or offense or whatever. And the State wanted him to testify that he did it."

- Manning put teardrop tattoos on his face, which signified that he had killed someone.

- "I cut Josh off . . . when he . . . went to tell me that he was guilty of this . . . crime . . . because I didn't want to hear it."

- "[Manning] didn't say [appellant] was in the house."[15]

- "I think somebody else was with him, but he didn't . . . tell me. I don't recall him telling me specifically anybody [sic] name. But I believe somebody else was with him."

- "I can't give you no timeframe."

- "[Manning] told me he was just robbing the dude. . . . He said he tried to run. He said he chased him down."

- "[Manning] said [the man he shot] ran inside the house."

- "[Manning] didn't clarify what type of house [they were in]. I'm pretty sure it wasn't no—no trailer though."

Manning did not tell Butler any other details of the crime. The trial court excluded the testimony on the ground that it was not corroborated by "circumstances that clearly indicate the trustworthiness of the statement."

Appellant argues this evidence was admissible as a statement against interest

---

[15] Appellant misstated the record in his appellate brief in stating, "Manning told Butler that appellant was not even in the house when the robbery and shooting occurred."

15

under Texas Rule of Evidence 803(24). A statement against interest in the criminal context is an exception to the hearsay rule that tends to subject the declarant to criminal liability. Tex. R. Evid. 803(24); *see also Walter v. State*, 267 S.W.3d 883, 890 (Tex. Crim. App. 2008). The rule sets out a two-step foundation requirement for admissibility. *Walter*, 267 S.W.3d at 890. First, the trial court must determine whether the statement, considering all the circumstances, subjects the declarant to criminal liability and whether the declarant realized this when he made the statement. *Id*. at 890-91. Second, the court must determine whether there are sufficient corroborating circumstances that clearly indicate the trustworthiness of the statement. *Id*. at 891. Both statements that are directly against the declarant's interest and collateral "blame-sharing" statements may be admissible under rule 803(24) if corroborating circumstances clearly indicate their trustworthiness. *Id*. at 896; *see also Orona v. State*, 341 S.W.3d 452, 464 (Tex. App.—Fort Worth 2011, pet. ref'd).

The determination of whether corroborating circumstances clearly indicate trustworthiness lies within the trial court's sound discretion. *Cunningham v. State*, 877 S.W.2d 310, 313 (Tex. Crim. App. 1994). When analyzing the sufficiency of corroborating circumstances, a number of factors are relevant: (1) whether the guilt of the declarant is inconsistent with the guilt of the defendant; (2) whether the declarant was so situated that he might have committed the crime; (3) the timing of the declaration; (4) the spontaneity of the declaration; (5) the relationship between the declarant and the party to whom the statement was made; and (6) the existence of independent corroborative facts. *Woods v. State*, 152 S.W.3d 105, 113 (Tex. Crim. App. 2004). The trial court may consider evidence which undermines the reliability of the statement as well as evidence corroborating its trustworthiness. *Cunningham*, 877 S.W.2d at 312; *see also Bingham v. State*, 987 S.W.2d 54, 58

16

(Tex. Crim. App. 1999).

Assuming without deciding that the excluded statement subjected Manning to criminal liability,[16] weighing the factors above, we conclude the trial court was within its discretion to conclude there are not sufficient corroborating circumstances that clearly indicate the trustworthiness of the statement. First, Manning's description of the shooting was not sufficiently detailed to determine whether he was referring to the same offense for which appellant was charged. Butler cut off Manning's story because Butler "didn't want to hear it." Manning did not provide details regarding when or where the shooting purportedly happened, whether there were witnesses, what type of gun he used, where the bullet struck the victim, or whether others participated in the crime. This lack of certainty regarding Manning's statement does not show whether his guilt is inconsistent with appellant's or that Manning was so situated that he might have committed this crime. *See Prince v. State*, 192 S.W.3d 49, 59 (Tex. App.— Houston [14th Dist.] 2006, pet. ref'd) (holding guilt of declarant was inconsistent with guilt of defendant when, among other things, evidence did not indicate declarant's location or situation at the time of murder, declaration was made several months after the defendant was arrested for murder, and statement did not indicate declarant had intimate familiarity with the crime, revealing only general reports of the crime).

Second, the timing and the relationship between Manning and Butler, another inmate, indicates that Manning could have made the statement to appear tougher among the other, older inmates. Manning told Butler that he already had

---

[16] Manning apparently pleaded guilty to murder in connection with the robbery. It is unclear from the record whether he had done so by the time he made the statement to Butler, although appellant proffered testimony from Butler that Manning already had pleaded guilty when he made the statement.

17

entered into a plea bargain with the State and was aware that he was facing significant jail time. Thus, although Manning made the spontaneous statement at a time when he had no motive to minimize his involvement in the crime, he may have had a motive to bolster his reputation with the other inmates.

Third, and perhaps most importantly, even if Manning's statement that he was the shooter referred to this case, it is not corroborated by the facts presented at trial. Manning said that he shot a man during the course of a robbery while chasing him into a house. By contrast, the evidence presented at trial was that Mauricio was inside an apartment coming down the stairs when he was shot. He was not "chased down" by his assailant into a house. In addition, Mendiete and Norma both positively identified appellant as the shooter, and Alberto testified the man in the white shirt, whose description matched Wright's, was the person who attacked him. The murder weapon was found at the house where appellant and Wright—not Manning—sometimes stayed. Moreover, all three witnesses testified a third perpetrator served as the lookout, whom Norma testified was "a little younger" than the others, which pointed to Manning. *See Gonzalez v. State*, 296 S.W.3d 620, 629 (Tex. App.—El Paso 2009, pet. ref'd) (holding timing of statement combined with contradictory testimony of two witnesses was not sufficiently convincing to clearly indicate its trustworthiness).

After carefully weighing the factors and the evidence, we conclude they support the trial court's finding that Manning's statement was unreliable. Because there were insufficient corroborating circumstances to indicate the trustworthiness of Manning's statements, we conclude appellant failed to show the trial court abused its discretion.[17] *See Prince*, 192 S.W.3d at 59; *see also Auston v. State*, 892

---

[17] Appellant also argues, "If Manning was [sic] on trial instead of appellant, the State would have sought to introduce Butler's testimony against Manning under art. 38.075, which clearly lowers the burden of 'corroboration' found in T.R.E. [sic] 803(24)." Assuming the truth

18

S.W.2d 141, 144 (Tex. App.—Houston [14th Dist.] 1994, no pet.) ("Under such circumstances where the factors indicating untrustworthiness are at least equal to or greater than those offered to support the trustworthiness of the alleged statement, we cannot, as requested, find that corroborating circumstances clearly indicate trustworthiness.").

Appellant also argues the trial court abused its discretion in excluding Manning's statement to Butler (1) to rebut the State's evidence of Manning's statement to the officer that Manning was not the shooter and (2) in violation of appellant's right under the Confrontation Clause of the United States Constitution to present a complete defense.[18] Appellant offered Manning's statement to Butler as a statement against interest, but expressly did not offer it to rebut the State's evidence of Manning's statement to the officer.[19] Moreover, appellant did not complain in the trial court that the exclusion of the evidence violated his right to present a complete defense. Appellant thus has waived these arguments on appeal. *See Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) (citing

---

of appellant's assertion, it is unclear how it would support a holding that the testimony was admissible in this case.

[18] A defendant's constitutional right to a meaningful opportunity to present a complete defense is rooted in the Fourteenth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process and Confrontation Clauses under the United States Constitution. *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009).

[19] Defense counsel stated,

[A]s to whether or not it's hearsay, it is. But it clearly is a statement against penal interest. . . . But our position is . . . that *we're not here to impeach Joshua Manning*, as much as we are offering a defensive theory for . . . [appellant].

. . . .

[W]e're offering under the 802, the exception to hearsay Rule 24, statement against penal interests—or statement against interests. Clearly the declarant in this case, Joshua Manning, has made a statement that exposes him to criminal liability. And it is sufficiently corroborated by the evidence in this case.

(Emphasis added.)

19

*Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (noting a defendant forfeits a claim that he was denied the right to present a defense under the United States and Texas Constitutions by failing to lodge proper objection at trial)); *see also Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005) (acknowledging to avoid waiver on appeal, party seeking to introduce evidence must object at trial to trial court's exclusion of evidence with an argument stating the "very complaint that party is now making on appeal").

For the foregoing reasons, we overrule appellant's second issue.

## III.   No Error Regarding Closing Argument

In his third issue, appellant contends the trial court abused its discretion by allowing the State's attorney to ask the jurors to place themselves in the shoes of the victim and to personally attack defense counsel. We conclude the first complaint and part of the second were not preserved and the trial court did not abuse its discretion in overruling the remainder of the second complaint.

During closing argument, the State's attorney asked the jury to "imagine" what it must have been like for Norma to experience the events that she did. Appellant argues this was improper jury argument, but concedes defense counsel did not object to it. Therefore, appellant has waived this complaint.[20] *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) ("[A] defendant's failure to object to a jury argument or . . . to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal."); *see*

---

[20] Appellant urges us to follow *Boyington v. State*, 738 S.W.2d 704 (Tex. App.—Houston [1st Dist.] 1985, no pet.), in which the court of appeals reversed the defendant's conviction despite defense counsel's failure to object to the State's argument in which he asked the jurors to put themselves in the place of the victims. *Id.* at 710. However, in that case, the court of appeals held that defense counsel's failure to object to the prosecutor's argument constituted ineffective assistance of counsel. *Id.* at 709-10. Ineffective assistance of counsel is not at issue here.

*also Nadal v. State*, 348 S.W.3d 304, 319 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

Appellant also argues the following statements by defense counsel during closing argument were improper:

- "And that's another tactic by the defense, to point the finger somewhere else but at their client"; and

- "[D]on't think about the dog and pony show that they did, to try to direct you off the evidence that you know to point toward this man."

Defense counsel objected to the first statement but not the second. Therefore, appellant did not preserve error regarding the second statement. *See Cockrell*, 933 S.W.2d at 89; *see also Nadal*, 348 S.W.3d at 319. We thus only address whether the trial court abused its discretion in failing to exclude the first statement.[21]

Jury argument must fall into one of four areas to be permissible: (1) summation of evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007); *Ayala v. State*, 267 S.W.3d 428, 433 (Tex. App.—Houston [14th Dist.] 2008, pet. filed). Even when an argument exceeds the permissible bounds of these approved areas, an error will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Ayala*, 267 S.W.3d at 433. A prosecutor runs the risk of going outside of these permissible areas when her

---

[21] Appellant also argues the State's argument "presents a [Fourteenth Amendment] due process claim because it so infected the trial with unfairness that . . . appellant's conviction constitutes a denial of protection guaranteed by the United States and Texas Constitutions." Appellant did not object to the State's argument on this basis at trial and thus has waived this argument on appeal. *See Broxton*, 909 S.W.2d at 918 (noting complaints, even of constitutional magnitude, are waived on appeal if not called to trial court's attention).

argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). However, we consider counsel's remarks during final argument in the context in which they appear. *Ayala*, 267 S.W.3d at 433.

Here, viewing the State's argument in its entire context, the statement that defense counsel's strategy was a "tactic" to "point the finger somewhere else" was not an attack on defense counsel. Rather, it was an answer to the argument of opposing counsel that the witnesses had misidentified appellant as the shooter and that forensic evidence did not incriminate appellant. *See, e.g., Coble v. State*, 871 S.W.2d 192, 205 (Tex. Crim. App. 1993) (concluding trial court did not abuse discretion in overruling objection to prosecutor's remark that defense counsel was arguing "something ridiculous" in response to defense counsel's argument); *Pope v. State*, 161 S.W.3d 114, 126-27 (Tex. App.—Fort Worth 2004) (concluding State's references to defense counsel's attacks on DNA evidence as "smoke and mirrors" and "red herrings or rabbit trails" designed to throw the jury off and cautioning the jury not to be "hoodwinked, . . . buffaloed, . . . [or] spooked" by the defense's arguments were proper responses to arguments of the defense), *aff'd*, 207 S.W.3d 352 (Tex. Crim. App. 2006); *Gonzales v. State*, 831 S.W.2d 491, 494 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) (holding prosecutor's reference to defense counsel's argument as "rabbit trails" and "bunny trails" was proper response to defense counsel's argument). Thus, the trial court did not abuse its discretion in overruling appellant's objection to the statement.

We overrule appellant's third issue.

## IV. No Error in Admitting Evidence Regarding Pretrial Photo Identifications

In his fourth issue, appellant argues that the trial court abused its discretion

in admitting evidence regarding pretrial photo identifications by Norma, Mendiete, and Johnson. Appellant did not preserve error on his objection to the pretrial identification by Norma.[22] *See Perry v. State*, 703 S.W.2d 668, 670 (Tex. Crim. App. 1986) (requiring defendant to complain or object in the trial court to preserve argument that pretrial identification was suggestive); *see also Haq v. State*, 01-11-01057-CR, 2013 WL 1890260, at *6 (Tex. App.—Houston [1st Dist.] May 7, 2013, no pet.); *Degarmo v. State*, 922 S.W.2d 256, 268 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd). Accordingly, we address only appellant's complaints regarding his pretrial identifications by Mendiete and Johnson.

Appellant neither objected at trial to the witnesses' in-court identifications nor challenges them on appeal. The failure to complain or object in the trial court to in-court identifications waives any complaint regarding the in-court identifications on appeal. *See Ballah v. State*, No. 14-10-00460-CR, 2012 WL 19653, at *2 (Tex. App.—Houston [14th Dist.] Jan. 5, 2012, pet. ref'd) (mem. op.) (citing *Perry v. State*, 703 S.W.2d 668, 670, 673 (Tex. Crim. App. 1986)). Therefore, we consider only appellant's arguments concerning the pretrial identification procedures with regard to Mendiete and Johnson. *See id*.

---

[22] Appellant objected to his pretrial identification by Mendiete by urging an oral motion to suppress at trial. Appellant objected to his pretrial identification by Johnson during a hearing in which the State proffered testimonial evidence by an officer regarding that photo lineup.

Norma testified that she viewed a photo lineup at the police station about a month after the offense and identified someone. Conversely, two officers testified Norma did not identify appellant in a pretrial photo lineup. According to the officers, Norma only viewed a photo lineup at the police station on the morning after the offense, which did not include a picture of appellant.

Appellant's attorney objected to the admission of Norma's pretrial identification on the ground that "the evidence of confusion with [Norma], as to whether or not she was even shown a photo spread, leads questions to the v[e]racity of the process." This objection was too late because it came after Norma's testimony and one officer's testimony regarding Norma's viewing of the photo lineup had been admitted. *See* Tex. R. App. P. 33.1 (requiring timely and specific objection to preserve error).

23

We review de novo the question of whether a pretrial identification procedure was impermissibly suggestive. *Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009); *Adams v. State*, 397 S.W.3d 760, 764 (Tex. App.—Houston [14th Dist.] 2013, no pet.). First, we determine if the pretrial identification procedure was impermissibly suggestive. *Gamboa*, 296 S.W.3d at 581; *Adams*, 397 S.W.3d at 764. Second, if we conclude that the procedure was impermissibly suggestive, we then determine if the impermissibly suggestive nature of the pretrial lineup gave rise to a substantial likelihood of irreparable misidentification. *Gamboa*, 296 S.W.3d at 581-82; *Adams*, 397 S.W.3d at 764. If the pretrial procedure is found to be impermissibly suggestive, identification testimony would nevertheless be admissible where the totality of the circumstances shows no substantial likelihood of misidentification. *Adams*, 397 S.W.3d at 764. Appellant must show by clear and convincing evidence that the identification has been irreparably tainted before we can reverse his conviction. *See Barley v. State*, 906 S.W.2d 27, 34 (Tex. Crim. App. 1995); *see also Santos v. State*, 116 S.W.3d 447, 451 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

Assuming without deciding that the pretrial identification procedures used in this case were impermissibly suggestive, appellant has failed to show by clear and convincing evidence that these procedures gave rise to a substantial likelihood of irreparable misidentification. The factors we consider when determining this issue include (1) the witness's opportunity to view the perpetrator at the time of the offense, (2) the witness's degree of attention during the offense, (3) the accuracy of the witness's prior description of the perpetrator, (4) the witness's level of certainty regarding his identification at the time of confrontation, and (5) the lapse of time between the offense and the subsequent confrontation. *Gamboa*, 296 S.W.3d at 582; *Adams*, 397 S.W.3d at 764. We consider these issues of historical fact in the

24

light most favorable to the trial court's ruling, then weigh them de novo against the "corrupting effect" of the suggestive pretrial identification procedure. *Adams*, 397 S.W.3d at 764.

Here, Mendiete testified in detail regarding the several minutes during which he was able to observe the suspect at very close range. Mendiete testified he was lying face up, appellant was within a few feet of him, the lighting was good, and Mendiete was able to get a good look at appellant's face and eyes and recognized appellant at trial.[23] Mendiete's description of appellant—that he was wearing a red shirt and black head covering—was consistent with other witnesses' descriptions and appellant's appearance on the video less than an hour after the robbery. An officer testified that Mendiete immediately chose the photograph of appellant and told the officer he was "[o]ne hundred percent" certain that appellant was the assailant who shot Mauricio. The identification occurred less than a month after the offense.

From the context of Johnson's testimony, it was clear that he got a good look at the suspect at very close range. Johnson testified he could reach out and touch his assailants when they came into his apartment, they were approximately four to five feet away, and he "could clearly make out [appellant's] face" and had "no problem seeing his facial features." Johnson also testified he paid close attention to his assailant because he was holding a gun. Johnson's description of appellant also matched the other witnesses' descriptions—that he was wearing a red shirt and dark (black or navy) cap—and appellant's appearance on the video. Although

---

[23] Appellant argues Mendiete's testimony was inconsistent with regard to whether Mendiete was lying face up or face down, whether he saw three men or only two, and who shot Javier. Appellant also complains that the detail about the red shirt was not included in Mendiete's statement to the police. These are credibility issues that we leave to the trial court. *See Adams*, 397 S.W.3d at 763.

appellant took 15 to 30 seconds to choose between two photographs,[24] an officer testified Johnson reported he was "sure" about his identification of appellant as his assailant. When Johnson made his choice, he said, "This is the guy." The identification occurred only twelve days after the offense.

Based on the foregoing facts, even if the photo lineups were impermissibly suggestive, the totality of the circumstances shows no substantial likelihood of misidentification occurred. *See Adams*, 397 S.W.3d at 764.

We overrule appellant's fourth issue.

## V. No Error in Admitting Evidence of Extraneous Offenses

In his fifth issue, appellant complains that the trial court abused its discretion in admitting evidence of the following extraneous offenses in violation of Texas Rules of Evidence 403[25] and 404: the aggravated robbery and assault of Johnson and the aggravated assault of Mitchell, which occurred as the suspects drove away from Johnson's apartment complex.

Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Tex. R. Evid. 404(b); *Martin v. State*, 173 S.W.3d 463, 466 (Tex. Crim. App. 2005). Rule 403 provides that even relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair

---

[24] Before choosing the photo of appellant, Johnson told the officer that the suspect in one photo had a similar chin, nose and mouth and the suspect in the other photo had similar eyebrows to appellant's. The officer testified Johnson took an unusually long time to choose between the two photos.

[25] Appellant states that Rule 403 "provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice," *see* Texas Rule of Evidence 403, but does not analyze how the probative value of the extraneous offenses was outweighed by the danger of unfair prejudice. We nonetheless address the issue in conjunction with appellant's extraneous offense argument.

prejudice," among other things. Tex. R. Evid. 403; *Martin*, 173 S.W.3d at 466. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401; *Martin*, 173 S.W.3d at 466. However, Rule 404(b) also provides that extraneous offense evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" *Martin*, 173 S.W.3d at 466 (quoting Rule 404(b)). This list is illustrative, rather than exhaustive, and extraneous-offense evidence may be admissible when a defendant raises a defensive issue that negates one of the elements of the offense. *Id.* Thus, a party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact. *Id.* Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court. *Id.*

In this case, appellant's identity as the perpetrator of the crime was hotly contested. Identity may be placed in dispute by the defendant's opening statement or cross-examination, as well as by affirmative evidence offered by the defense. *Segundo v. State*, 270 S.W.3d 79, 86 (Tex. Crim. App. 2008). Cross examination places identity at issue if it implies the witness's identification of the defendant is not trustworthy. *See Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004). Throughout trial, appellant raised the issue of identity as a defense by vigorously cross-examining witnesses regarding the reliability of their in and out of court identifications[26] and presenting evidence that the witnesses may have mistaken

_____

[26] Appellant cross examined the witnesses regarding whether they could identify him

27

appellant for Wright, his cousin who resembled him. Accordingly, appellant placed his identity as the perpetrator in dispute. But our inquiry does not end with a defendant's raising the issue of identity. *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006).

Extraneous offense evidence is admissible under both Rules 404(b) and 403 if that evidence satisfies a two-prong test: whether the evidence is relevant to a fact of consequence in the case apart from its tendency to prove conduct in conformity with character and whether the probative value of the evidence is substantially outweighed by unfair prejudice. *Page*, 213 S.W.3d at 336; *Martin*, 173 S.W.3d at 466. We must uphold a trial court's ruling on the admissibility of evidence "as long as the trial court's ruling was at least within the zone of reasonable disagreement." *Martin*, 173 S.W.3d at 467.

When the extraneous offense is introduced to prove identity by comparing common characteristics, it must be so similar to the charged offense that the offenses illustrate the defendant's "distinctive and idiosyncratic manner of committing criminal acts." *Page*, 213 S.W.3d at 336; *Martin*, 173 S.W.3d at 468. Such extraneous offense evidence is admissible to prove identity when the common characteristics of each offense are so unusual as to act as the defendant's "signature." *Page*, 213 S.W.3d at 336. The signature must be apparent from a comparison of the circumstances in both cases. *Id.* To determine the similarity between the offenses for the purpose of establishing identity, appellate courts should take into account both the specific characteristics of the offenses and the time interval between them. *Johnson v. State*, 68 S.W.3d 644, 651 (Tex. Crim. App. 2002). The extraneous offense and the charged offense can be different

because of their ability to see his face, the lighting in their homes at the time of the crimes, whether they needed—and if so, wore—glasses, their perception of his height and weight, and their ability to recall his features.

offenses, so long as the similarities between the two offenses are such that the evidence is relevant. *Thomas v. State*, 126 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

The extraneous offenses in this case bear striking similarities to the offense for which appellant was convicted. Both robberies were home invasions where the front door was kicked in and involved three African American males. One suspect in each robbery was wearing a red shirt and black hat, and one suspect in each robbery was wearing a white shirt. The suspect in the red shirt carried a small gun and appeared to be in charge, and in both robberies, a second suspect carried a gun. In both cases, someone was shot. The incidents occurred at neighboring apartment complexes and were reported to 911 eight minutes apart. Appellant was positively identified in both robberies. The bullets that killed Mauricio and were fired at Mitchell were fired from the same gun. Mitchell's description of the vehicle fleeing the scene of the first robbery matched the vehicle found in the parking lot at the apartment complex where Mauricio was murdered.

We conclude the evidence of the extraneous offenses admitted at trial was highly probative of appellant's identity as the perpetrator and thus relevant to a fact of consequence in the case apart from its tendency to prove conduct in conformity with character. *See Johnson*, 68 S.W.3d at 650-51. We further conclude that the similarity of the specific characteristics of the offenses, the proximity of the locations, and the time interval between them show that the probative value of the extraneous offenses was not substantially outweighed by the danger of unfair prejudice. *See id*. at 651; *see also Karnes v. State*, 127 S.W.3d 184, 191 (Tex. App.—Fort Worth 2003, pet. ref'd) ("We conclude that the proximity in time and place of each offense, the common mode in which they were committed, and the circumstances surrounding the offenses were sufficiently similar to justify

29

admission of the extraneous offense evidence on the issue of identity.").

Moreover, the facts of the extraneous offenses were interwoven with the investigation of Mauricio's murder and necessary because there was no physical evidence linking appellant to the crime scene. *See Johnson*, 68 S.W.3d at 651-52 (holding extraneous offense evidence was not unfairly prejudicial even though State had DNA evidence, fingerprints, and written and oral confessions). The extraneous offense evidence provided eye witness testimony and ballistic evidence inferentially linking appellant to the second robbery and murder. *See id*. Accordingly, the evidence was not unfairly prejudicial, and the trial court did not abuse its discretion in admitting the extraneous offense evidence. *See id*.

We overrule appellant's fifth issue.

## VI. No Jury Charge Error

In his sixth issue, appellant complains of the trial court's failure to instruct the jury on the admissibility of the extraneous offenses to rebut appellant's defensive theory. *See Owens v. State*, 827 S.W.2d 911, 917 (Tex. Crim. App. 1992) (holding extraneous offense evidence was not admissible to rebut defensive theory because the defensive theory was not presented to the jury in the trial court's limiting instruction).

Our first duty in analyzing a criminal jury charge issue is to decide whether error exists. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Lovings v. State*, 376 S.W.3d 328, 337 (Tex. App.—Houston [14th Dist.] 2012, no pet.). If error is found, the degree of harm necessary for reversal depends on whether the appellant preserved the error by objecting to the complained of instruction. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006); *see also Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g);

30

*Lovings*, 376 S.W.3d at 337. If the defendant properly objected to the erroneous jury charge instruction, reversal is required if we find "some harm" to the defendant's rights. *Olivas*, 202 S.W.3d at 144 n.21; *Lovings*, 376 S.W.3d at 337. If the error was not objected to, it must be "fundamental" and requires reversal only if it was so egregious and created such harm that the defendant "has not had a fair and impartial trial." *Barrios*, 283 S.W.3d at 350; *Lovings*, 376 S.W.3d at 339.

At trial, defense counsel stated that he had no objections to the court's charge. Therefore, appellant was required to show both that the trial court erred by failing to instruct the jury on the admissibility of extraneous offense evidence to rebut a defensive theory and that the trial court's error caused him egregious harm. *See Olivas*, 202 S.W.3d at 144; *see also Lovings*, 376 S.W.3d at 337.

Appellant's sole defensive theory at trial was that he had been misidentified by the witnesses. Appellant cites *Owens* for the proposition that the trial court was required to submit a limiting instruction on his defensive theory. 827 S.W.2d 911. In that case, the State argued extraneous offense evidence was admissible to rebut the defendant's implied theory of "frame-up." *Id.* at 917. The Court of Criminal Appeals noted, "[E]xtraneous offense evidence of a defendant's [modus operandi] is admissible only as proof of some other basis of admissibility [such as] *identity* or lack of mistake." *Id.* (emphasis added). Assuming the evidence was admissible, the court held that without a limiting instruction, "there [was] no way for an appellate court to know whether the jury properly applied the evidence of appellant's [modus operandi] to rebut the weight or credibility of [the defendant's] 'frame-up' theory or relied on it for an improper basis such as character conformity." *Id.* There was no dispute in *Owens* as to identity, motive, intent or any of the other exceptions listed in rule 404(b). *Webb v. State*, 36 S.W.3d 164, 180 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (citing *Owens*, 827 S.W.2d

at 916).

Here, the trial court properly instructed the jury to consider the extraneous offense evidence only for the purposes allowed under Rule of Evidence 404(b), which included determining identity.[27] *See Blackwell v. State*, 193 S.W.3d 1, 16 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding trial court's Rule 404(b) instruction that jury could consider extraneous offense evidence only "in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant" properly limited the jury's reliance on the extraneous offense evidence to defensive issues that the defendant raised, specifically, his motive and intent to commit the offense). We conclude, therefore, that the trial court did not err.

We overrule appellant's sixth issue.

We affirm the judgment of the trial court.


/s/     Martha Hill Jamison
Justice


Panel consists of Justices Boyce, Jamison, and Busby.

Publish — TEX. R. APP. P. 47.2(b).

---

[27] The jury charge reads:

[I]f there is any evidence before you in this case regarding the defendant's committing an alleged offense or offenses other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, *identity*, or absence of mistake or accident of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

(Emphasis added.) *See* Tex. R. Evid. 404 (b).

32