

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ANNA RUILOBA, | § | No. 08-17-00123-CR |
| Appellant, | § | Appeal from the |
| v. | § | 171st District Court |
| | § | |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| | § | |
| Appellee. | § | (TC# 20140D02097) |
| | § | |

**O P I N I O N**

For a period of time, El Paso was home to the largest Harley-Davidson motorcycle dealership in the world. Our appellant here, Anna Ruiloba, worked for the dealership processing vehicle titles from 2002 to 2011. After she resigned from that job, the dealership discovered that almost half a million dollars in unauthorized company checks had been written to her personal accounts. And relevant to our involvement, a jury later convicted her of committing first degree misapplication of fiduciary property and theft related to those checks. She now appeals contending that: (1) the evidence is legally insufficient to support the misapplication of fiduciary property charge because any misapplied funds were not held in a fiduciary capacity; and (2) the trial court erred in formulating the theft charge, causing her egregious harm. We conclude that her complaints lack sufficient merit to require reversal and affirm the judgment below.

1

Barnett Harley-Davidson is a family owned business. The patriarch, Sherman Barnett, founded the business in 1977. His son Mark, and wife, Christine, assist in different capacities with the El Paso store. The dealership employs between 160 and 220 persons, and grosses over two million dollars a month. It has sold as many as three hundred motorcycles a month.

Appellant worked as a title clerk for the dealership. Anytime a motorcycle was sold, the title for the vehicle needed to reflect the new owner, and any financing entity as lienholder. And when title changed hands, the relevant taxing authorities required payment of taxes and fees. One of Appellant's job duties involved preparing a check to pay any taxes and fees to the appropriate government entity. Because Barnett sold motorcycles to people from across the country, Appellant prepared checks to taxing entities from several states. Only Sherman, Mark, and Christine Barnett could sign the checks. Accordingly, Appellant might prepare a batch of several checks for either Sherman, Mark, or Christine's signature. Appellant would then send the check to the appropriate taxing entity.

Appellant was a highly regarded employee until an incident involving a missing motorcycle in 2011. A motorcycle that Barnett had taken as a trade-in showed up missing, as was its title. Appellant had handled the title paperwork, and the sales file was also missing. As the staff searched the accounting area for the file, Appellant repeatedly went to her personal vehicle to look for the file, which was strange because paperwork is never taken out of the office. Later in the day, Appellant found the file. And following that event, Appellant started missing more and more work until she resigned on April 28, 2011.

When the dealership immediately accepted the resignation, Appellant went to her desk and started tearing up papers. She was told to stop and instructed to leave the premises. Another file

clerk then went through her desk to work any pending matters. The clerk found a cashier's check payable to an Arizona taxing authority which the clerk then mailed out. But the check was soon returned as a duplicate payment because the dealership had already paid the identical amount some time earlier. This made Elfie Watters, the controller, suspicious so she looked up the last ten checks that Appellant had been responsible for issuing and discovered that all ten had been made payable to an account number at First Bank of Texas and had been endorsed for deposit by Appellant. Subsequent investigation determined that the bank account belonged to Appellant.

Following a more thorough investigation, Barnett determined that over several years, Appellant had misdirected over two hundred checks from the operating account to her own accounts; the unauthorized checks totaled $471,949.46. Appellant was later indicted and tried on a two-count indictment for theft and misapplication of fiduciary property over $200,000. The trial testimony described several different schemes for how the money was taken.

First, for some checks, the jury heard testimony that Appellant simply forged the signature of one of the authorized signatories. Second, and for another block of checks, Appellant would issue a legitimate check to the taxing authority tied to a particular sale and forward the check to the taxing authority. Then, several months later, she would issue another check in the same amount made payable to the same taxing entity. But after the second check was signed, she was able to delete name of the taxing authority as the payee and insert her own bank and bank account number as the new payee. She would then deposit the check into her account. Because there was a time gap between the legitimate original check, and the doctored duplicate check, no one at the dealership was alerted to the issuance of two checks for the same amount on the same transaction. And on some transactions, the check she made out to herself was for more than the original amount for taxes and fees. The fact that the dealership processed over 700 checks a month also obscured

3

the two to three checks per month that she ran through.[1] Third, Appellant took some refund checks that were payable to customers and substituted in her name and account number, which resulted in a theft of the customers' funds.

Around 2007 or 2008, Barnett and its bank instituted a new program where the dealership would electronically input the name of the payee to the bank. In turn, the bank would not honor any check unless the payee on the check matched exactly the name of the payee that had been previously inputted. Around that same time, Appellant informed the dealership that out-of-state taxing authorities were requiring cashier's checks.[2] To obtain certified funds, Barnett would now issue a check to its own bank in the amount of the tax, and have the bank issue a cashier's check to the relevant taxing authority. The payee on Barnett's check thus exactly matched what it inputted into the system. But Appellant then took that cashier's check, changed the name of the payee to herself, and thus circumvented the new check security program.

The State admitted into evidence a series of more than two hundred distinct transactions dated from December 2003 to March 2011. For the most part, each of those transactions consist of a check that is made payable to one of several bank accounts that Appellant owned. The backside of the check contains her endorsement. On some of the transactions, an internal Barnett document describes the check and the amount as a tax on a particular customer's transaction. Testimony showed that Appellant was responsible for making that entry into Barnett's ledger. Most of the transaction exhibits also contain Appellant's bank statement confirming the deposit, and Barnett's bank statement, documenting the debit.

Appellant testified in her own defense and did not challenge the fact that she deposited

---

[1] As one witness also recounted, the staff would bring a stack of checks in for Mr. Barnett to sign and he "would have a really bad habit of just sign[ing] checks without looking."

[2] Yet some trial testimony showed that only Ohio imposed that requirement.

4

these funds into her account. Rather, her defense claimed that the dealership authorized these payments and structured them as they did to avoid paying taxes. She claimed that the payments were compensation for several additional tasks she performed for the dealership. For instance, she testified that Barnett gave her a list of motorcycles for which the lien had not been properly perfected. She claimed she was to be paid a 10% commission on each lien she could perfect. She also claimed that she was to be paid a commission on the collection of certain accounts receivable. Other claimed payments were for off-the-book work for doing vehicle-identification-number inspections for motorcycles sold in New Mexico, and fabricating documents to avoid or pass governmental audits. According to Appellant, Elfie Watters would place a "post-it-note" with a dollar amount on her computer reflecting the commissions, and Appellant was then to prepare a payment as we describe above. Appellant in fact described to the jury how she would place a piece of tape over the check where the payee line goes so it would print one name on the check copy, but not the original check. She claimed that Elfie Watters showed her how to do this. She raised with the jury the fact that Barnett hired her knowing that she had a criminal record--ostensibly so it could count on her to break the rules for the dealership, or take the fall if need be.[3]

Appellant's defense, however, put her testimony in sharp contrast with the other witnesses. Elfie Watters testified at length and denied that there was ever any list of unperfected liens that Appellant was working on. Ms. Watters also testified to her sense of surprise and betrayal when she discovered the fact of the forged and altered checks. And while Appellant testified that the dealership fabricated DOT and Texas tax records to pass audits, two former employees testified in rebuttal and refuted that claim.

---

[3] Appellant had previously been convicted of embezzlement when she worked at a credit union and disclosed that fact on her employment application. Elfie Watters acknowledged that fact but testified that she was desperate for a title clerk and Appellant said she made a mistake that she would never repeat again.

5

The jury apparently disbelieved Appellant's version of events. It found her guilty on two charges: (1) misapplication of fiduciary property; and (2) theft, both involving $200,000 or more. Following additional testimony on punishment, she was assessed a 62-year sentence on each charge, to run concurrently. This appeal follows.

MISAPPLICATION OF FIDUCIARY PROPERTY

In her first issue, Appellant challenges the sufficiency of the evidence to support a conviction for misapplication of fiduciary property. We start with the elements of the offense.

## A. Applicable Law

A person commits first-degree felony misapplication of fiduciary property if she (1) intentionally, knowingly, or recklessly misapplies property that she (2) holds as a fiduciary (3) in a manner that involves substantial risk of loss to the owner of the property, and (4) the value of the property misapplied is $200,000 or more. TEX.PENAL CODE ANN. § 32.45(b), (c)(7).[4] The Penal Code defines several relevant terms for this crime. A "fiduciary" includes those persons who typically fill that role, such as trustees, guardians, executors, and receivers. *Id*. at § 32.45(a)(1)(A). The term also includes "an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary." *Id.* § 32.45(a)(1)(D). And relevant here, a fiduciary is also defined as "any other person acting in a fiduciary capacity" (other than a commercial bailee). *Id*. at § 32.45(a)(1)(C).

A person misapplies property when they deal with it contrary to an agreement under which the fiduciary holds the property. *Id.* § 32.45(a)(2)(A). While the term "agreement" is not statutorily defined, courts have held that an agreement need not be written, but rather, must merely

---

[4] Effective September 1, 2015, the legislature increased this amount to $300,000 for an offense committed after that date. Act of June 20, 2015, 84th Leg., R.S., ch. 1251, § 5, 2015 Tex.Gen.Laws 4209, 4211 (codified at TEX.PENAL CODE ANN. § 32.45(c)(6)).

be a "harmonious understanding or an arrangement, as between two or more parties, as to a course of action." *Bynum v. State*, 767 S.W.2d 769, 777 (Tex.Crim.App. 1989); s*ee also Martinez v. State*, No. 08-13-00363-CR, 2016 WL 2864952, at *2 (Tex.App.--El Paso May 13, 2016, no pet.) (not designated for publication).

Appellant here claims that the State failed to present legally sufficient evidence that any of the funds that Appellant directed to her own account were held in a fiduciary capacity.

**B. Standard of Review**

In a legal sufficiency challenge, we focus solely on whether the evidence, when viewed in the light most favorable to the verdict, would permit *any* rational jury to find the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010) (establishing legal insufficiency under *Jackson v. Virginia* as the only standard for review of the evidence). Our system designates the jury as the sole arbiter of the credibility and the weight attached to the testimony of each witness. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014). The jury also discharges the duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 319. In doing so, the jury may choose to believe or disbelieve that testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App. 2008); *Belton v. State*, 900 S.W.2d 886, 897 (Tex.App.--El Paso 1995, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination." *Dobbs*, 434 S.W.3d at 170; *see also Jackson*, 443 U.S. at 319.

7

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone may be sufficient to establish guilt. *Dobbs*, 434 S.W.3d at 170; *Carrizales v. State*, 414 S.W.3d 737, 742 n.20 (Tex.Crim.App. 2013). Each fact need not point directly and independently to the guilt of the defendant, so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Dobbs*, 434 S.W.3d at 170.

We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson*." *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). However, "[w]e are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex.Crim.App. 1988). Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Id.*, *citing Jackson*, 443 U.S. at 318.

**C. Application**

Appellant here claims that no rational jury could have concluded that the funds she diverted to her account were held in a fiduciary capacity. We disagree.

First, a rational jury might have concluded that Appellant acted in a fiduciary capacity in her duties as title clerk. Texas recognizes two types of fiduciary relationships. *Meyer v. Cathey*, 167 S.W.3d 327, 330-31 (Tex. 2005). "The first is a formal fiduciary relationship, which arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers." *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex.App.--Houston [1st Dist.] 2003, no pet.), *citing Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). "The second is an informal fiduciary relationship, which may arise from 'a moral, social,

8

domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.'" *Abetter Trucking Co.*, 113 S.W.3d at 508, *quoting Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998). Whether an informal relationship rises to the level of a fiduciary relationship is often a question of fact. *Crim Truck & Tractor Co. v. Navistar Int'l. Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992).

An agent generally has a fiduciary duty to act for the benefit of their principal in all matters connected with the agency. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002); *Abetter Trucking Co.*, 113 S.W.3d at 510. "Among the agent's fiduciary duties to the principal is . . . the duty to deal fairly with the principal in all transactions between them." *Johnson*, 73 S.W.3d at 200, *quoting* Restatement (Second) of Agency § 13, cmt. a (Am. Law Inst. 1958); *see also* Restatement (Third) Agency § 8.01 (Am. Law Inst. 2005) ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."). A master and servant (or employer—employee) are a species of the formal principal-agent relationship. Restatement (Second) Agency §§ 2, 25 (Am. Law Inst. 1958); Restatement (Third) Agency § 1.01 (Am. Law Inst. 2005) ("The elements of common-law agency are present in the relationships between employer and employee[.]"). As such, employment relationships may impose *some* fiduciary duties. *See Johnson*, 73 S.W.3d at 201-02. Thus, when a fiduciary relationship of agency exists between employee and employer, an employee has a duty to act primarily for the benefit of their employer in matters connected with the employment. *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 185 (Tex.App.--Houston [1st Dist.] 2005, no pet.).

There is sufficient evidence in the record that such a relationship of trust existed here. As the title clerk, Appellant was given access to a cabinet with the company's checks. She was responsible for filling out the amount of tax payment checks and the payee for those checks, and

then presenting them to one of the authorized signatories. Most importantly, once a check was signed--indicating a specific taxing authority as the payee--she was entrusted to mail the check to that payee. Instead, she changed the payee so as to direct the funds to her own account. There was also some evidence that as the senior title clerk, she was entrusted to complete the general ledger reconciliation for these types of transactions. In effect, she was entrusted with the duty to monitor the payments disbursed by the title clerks for accuracy. And for some of the transactions, she was entrusted with customer funds in the form of rebates for tax overpayments. Rather than send those funds to the customers, she named herself the payee, and deposited the funds into her own account.

Her misuse of the position mirrors analogous situations where courts have upheld convictions under the misapplication statute. *See Ki Chul Ha v. State*, No. 08-16-00161-CR, 2018 WL 3454906, at *4 (Tex.App.--El Paso July 18, 2018, no pet.) (person passing himself off as CPA and misapplying funds intended as tax payments); *Martinez*, 2016 WL 2864952, at *1 (evidence was sufficient to support existence of agreement that company-employed-bookkeeper would not pay himself excess compensation out of company funds); *Gonzalez v. State*, 954 S.W.2d 98, 104 (Tex.App.--San Antonio 1997, no pet.) (store clerk who was responsible for selling inventory and tendering proceeds into the cash till); *Starnes v. State*, 929 S.W.2d 135, 137 (Tex.App.--Fort Worth 1996, no pet.) (employee of the fire department was performing a fiduciary function by collecting money from each night's bingo game and depositing the funds in the department's account).

We recognize that a simple arms-length transaction does not give rise to a fiduciary relationship. *Berry v. State*, 424 S.W.3d 579, 585-87 (Tex.Crim.App. 2014) (evidence was insufficient to show that the defendant--a seller and installer of drapes and blinds--was a fiduciary

10

because he "had no special or confidential relationship with his customers beyond the usual contractual relationship that exists between any seller and a buyer of goods."). Instead, under the misapplication statute, a "fiduciary capacity" exists if a person's "relationship with another is based not only on trust, confidence, good faith, and utmost fair dealing, but also on a justifiable expectation that he will place the interests of the other party before his own." *Id*. at 585. We conclude, however, that the record here supports the justifiable expectation that Appellant would not have misdirected funds that Barnett intended only to pay tax liabilities.

Appellant also claims that no funds were "held" in a fiduciary capacity. She bases this claim in part on the argument that she was not an authorized signatory on Barnett's bank accounts. The misapplication statute does not define the term "hold." Therefore, we interpret the word according to its plain meaning. *See Ex parte Valdez,* 401 S.W.3d 651, 655 (Tex.Crim.App. 2013) ("We construe a statute in accordance with the plain meaning of its text unless the plain meaning leads to absurd results that the legislature could not have possibly intended."). In determining the plain meaning of words, we first turn to dictionary definitions. *State v. Holcombe,* 187 S.W.3d 496, 500 (Tex.Crim.App. 2006). "Hold" means to "have in one's possession" or "keep or reserve for someone." *The New Oxford American Dictionary* (2001); *see also*, *Webster's New Universal Unabridged Dictionary* (2003) ("to set aside reserve or retain"). The term "hold" in the context of a fiduciary relationship simply refers to a fiduciary's "care, custody, control, or management" of the property in question. *See Wiggins v. State*, No. 01-07-00672-CR, 2009 WL 2231806, at *6 (Tex.App.--Houston [1st Dist.] July 23, 2009), citing TEX. PENAL CODE ANN. § 1.07(39)).

Appellant's responsibilities as a title clerk included the preparation and delivery of the checks used to pay for customers' taxes and fees; she was not required to possess and control Barnett's bank accounts in order to misapply checks she held in a fiduciary capacity. It was enough

that she was entrusted to deliver checks to various taxing authorities. *Cf. McElroy v. State*, No. 08-00-00246-CR, 2001 WL 1137612, at *6 (Tex.App.–El Paso Sept. 27, 2001, no pet.) (not designated for publication) (holding the evidence sufficient to show that a secretary performed fiduciary functions on behalf of her employer by receiving premium payments from customers, inputting information into the business's computer system, and depositing money entrusted to her into various bank accounts).

We overrule Issue One.

### THEFT

The jury also found Appellant guilty of theft. Appellant challenges her conviction of that charge by arguing that the jury charge failed to include a requirement that any unlawful appropriation of property was by means of deception, and further than the nature of any deception was undefined for the jury.

### A. Standard of Review

When analyzing claimed jury charge error, we utilize a two-pronged test. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). The first prong requires us to determine whether error exists. *See Ngo*, 175 S.W.3d at 743. If no error is found, then the analysis ends; however, if charge error is found, the error is analyzed for harm. *See Almanza*, 686 S.W.2d at 171.

The amount of harm necessary to warrant a reversal depends on whether the accused objected to the jury charge, and thereby preserved the error. *Ngo*, 175 S.W.3d at 743; *Almanza*, 686 S.W.2d at 171; *see also Neal v. State*, 256 S.W.3d 264, 278 (Tex.Crim.App. 2008). If the error was preserved by a timely objection, we review the record to determine if the error caused the accused "some harm." *Ngo*, 175 S.W.3d at 743; *Almanza*, 686 S.W.2d at 171. However, if no

12

objection was lodged, as Appellant concedes here, we review the unpreserved jury charge error for egregious harm. *Almanza*, 686 S.W.2d at 171. Egregious harm is actual, rather than theoretical harm, and must be of such a nature that it deprived the accused of a fair and impartial trial or otherwise vitally affected the accused's defensive theory at trial. *See Villarreal v. State*, 453 S.W.3d 429, 433 (Tex.Crim.App. 2015); *Cosio v. State*, 353 S.W.3d 766, 777 (Tex.Crim.App. 2011). "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal*, 453 S.W.3d at 433, *quoting Reeves v. State*, 420 S.W.3d 812, 816 (Tex.Crim.App. 2013). In making an egregious harm determination, we examine (i) the entire charge; (ii) the state of the evidence, including contested issues and the weight of the evidence; (iii) arguments of counsel; and (iv) any other relevant information revealed by the record of the trial as a whole. *See Allen v. State*, 253 S.W.3d 260, 264 (Tex.Crim.App. 2008).

### B. Theft

"A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." TEX.PENAL CODE ANN. § 31.03(a). "Appropriation of property is unlawful if . . . it is without the owner's effective consent[.]" *Id.* at § 31.03(b)(1). And consent is not effective if it is induced by "deception or coercion[.]" *Id.* at § 31.01(3)(A). The theft statute in turns defines deception in one of five ways. *Id.* at § 31.01(1)(A)-(E).[5]

---

[5] The Code defines "deception" as follows:

(A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;

(B) failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true;

(C) preventing another from acquiring information likely to affect his judgment in the transaction;

(D) selling or otherwise transferring or encumbering property without disclosing a lien, security interest, adverse claim, or other legal impediment to the enjoyment of the property, whether the lien, security interest, claim, or impediment is or is not valid, or is or is not a matter of official record; or

13

**C. The Indictment and Jury Charge**

The indictment in this case did not allege any one of those types of deception. It simply alleged that Appellant "unlawfully appropriate[d], by acquiring and otherwise exercising control over property, [defined as currency of $200,000 or more] from, Barnett Harley-Davidson and Sherman Barnett, the owners thereof, with intent to deprive said owners of said property[.]" The abstract portion of charge, under a heading related to the "law of theft," stated:

> Our law provides that a person commits an offense if he unlawfully appropriates property with intent to deprive the owner of the property. Appropriation of property is unlawful if it is without the owner's effective consent.

The abstract portion of the charge then defined effective consent:

> "Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if induced by deception or coercion or given by a person the actor knows is not legally authorized to act for the owner.

The application portion of the charge did not incorporate the effective consent requirement or mention the concept of deception.[6]

**D. The Jury Charge Was Erroneous**

A trial court has an absolute duty to prepare a jury charge that accurately sets out the law applicable to the case. TEX.CODE CRIM.PROC.ANN. art. 36.14; *Oursbourn v. State*, 259 S.W.3d

---

(E) promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

TEX.PENAL CODE ANN. § 31.01.

[6] The application portion of the charge read:
> Now, if you find from the evidence beyond a reasonable doubt that on or about the 3rd day of December, 2003, and continued until on or about the 22nd day of February, 2011, in El Paso County, Texas, the Defendant, ANNA RUILOBA, did then and there, pursuant to one scheme and continuing course of conduct, unlawfully appropriate, by acquiring or otherwise exercising control over property, other than real property, to-wit: United States Currency, of the value of $200,000 or more from, Barnett Harley-Davidson and Sherman Barnett, the owners thereof, with intent to deprive said owners of said property, then you will find the Defendant, ANNA RUILOBA, "GUILTY" of THEFT OVER $200,000 (AGGREGATED), as alleged in Count II of the indictment (Verdict Form "C").

14

159, 179 (Tex.Crim.App. 2008). The "law applicable to the case" also includes statutory definitions that affect the meaning of the elements of the offense. *Lovings v. State*, 376 S.W.3d 328, 337 (Tex.App.--Houston [14th Dist.] 2012, no pet.) *citing Ouellette v. State*, 353 S.W.3d 868, 870 (Tex.Crim.App. 2011). Thus, a trial court is obliged to communicate to the jury each statutory definition that affects the meaning of an element of the offense. *Villarreal v. State*, 286 S.W.3d 321, 329 (Tex.Crim.App.), *cert. denied*, 558 U.S. 992 (2009).

The State here tacitly concedes that the application portion of the charge should have included the concept of deception. Appellant, however, concedes that no objection to that failing was urged below. Accordingly, we assume the charge was erroneous and consider only if the error was egregiously harmful. In this case, it was not.

### E. The Error Was Not Egregiously Harmful

In making an egregious harm determination, we examine (i) the entire charge; (ii) the state of the evidence, including contested issues and the weight of the evidence; (iii) arguments of counsel; and (iv) any other relevant information revealed by the record of the trial as a whole. *See Allen*, 253 S.W.3d at 264. Here, consideration of these elements, either independently or collectively do not show that the charge deprived Appellant of a "fair and impartial trial" or undermined her defensive theory at trial. *Villarreal*, 453 S.W.3d at 433.

First, we consider the charge as a whole. It correctly tracked the statutory language for theft. Its abstract section informed the jury that a person does not effectively consent if the consent is obtained by deception. And because the charge did not further define the term "deception" we "assume[ ] the jury would consider the most commonly understood meaning in its deliberations." *Olveda v. State*, 650 S.W.2d 408, 409 (Tex.Crim.App. 1983). Deception has a commonly understood meaning. *See Deception, Black's Law Dictionary* (10th Ed. 2014) ("The act of

15

deliberately causing someone to believe that something is true when the actor knows it to be false. A trick intended to make a person believe something untrue."); *Webster's Third New International Dictionary* (2002) ("The act of deceiving, cheating, hoodwinking, misleading, or deluding"). Any of these definitions would encompass Appellant's conduct.

Nor would the inclusion of a better or different definition of deception likely affect the issues contested below. The decision point for this jury was fairly simple. If it believed Appellant, each of the two hundred some odd checks written to her account were authorized by Barnett and was part of some subterfuge to pay her under the table. Conversely, if the jury believed the Barnett witnesses, the dealership was misled by Appellant into approving checks that she later altered so as to pay herself. The evidence on this point was sharply conflicting. How the term deception might have been defined would not alter that calculus. And there was ample evidence to explain why the jury rejected Appellant's theory. Most of the checks the State introduced exactly mirrored identical sums that the dealership legitimately paid for taxes or fees a month or so prior. Accordingly, those sums were not tied to a 10% commission on the savings from perfecting liens as Appellant claimed. Nor did the sums correlate to a percentage of accounts receivables that Appellant claims to have recovered.

We are cognizant of *MacDougall v. State,* 702 S.W.2d 650 (Tex.Crim.App. 1986) where the court held the failure to include the definition of deception, properly objected to at trial, caused some harm and was reversible error. Under the egregious harm standard, however, several of our sister courts have concluded that the statutory definitions of deception are broader than the common dictionary definition of the term. *See Malcolm v. State*, No. 04-10-00887-CR, 2012 WL 300420, at *3 (Tex.App.--San Antonio Feb. 1, 2012, pet. ref'd); *Martin v. State,* No. 10–03–00071–CR, 2004 WL 2305154, at *2 (Tex.App–Waco Oct. 13, 2004, pet. ref'd) (not designated

for publication); *Shelley v. State,* No. 01–86–00821–CR, 1987 WL 14554, at *3 (Tex.App.--Houston [1st Dist.] July 23, 1987, no pet.) (not designated for publication). And when the issue does not turn on the nature of the deception, egregious error is not shown. *Malcolm*, 2012 WL 300420, at *3 ("The only dispute was whether the information was provided with an intent to deceive the Department or as a result of a good faith mistake or error in calculations.").

Nor do the opening and closing arguments of counsel suggest that the absence of a specific definition of deception was important to this case. The State's prosecutor in closing reminded the jury that consent is not effective if induced by deception. Other than that fleeting reference, the concept of deception was not otherwise addressed by either counsel. Instead, each attorney vigorously argued whether the evidence supported their respective claims that the payments were in fact authorized.

And finally, no other consideration suggests that any charge error here affected the outcome of the case. As with many disputes, the jury had to assess the credibility of two competing stories based on the witness's demeanor, the logic of the stories, and the consistency with the documentary evidence. Appellant's story, however, was inconsistent with the written exhibits. The checks which she directed to herself most often were the same as tax payments made from specific motorcycle sales. They did not correlate to any commission amount she claimed as compensation, nor did she produce any documentary evidence verifying the nature of the side-work she claimed to perform. In sum, the State presented ample evidence of her guilt which is not affected by any shade or phase of a definition of "deception."[7]

---

[7] We also note the State urges in its brief that the evidence independently supports the claim that more than $200,000 was taken by Appellant forging Christine Barnett's signature. That claim is independent of any need for a definition of deception and could by itself support the verdict on theft.

17

We overrule Issue Two and affirm the judgments of conviction below.

JEFF ALLEY, Chief Justice

November 14, 2019

Before Alley, C.J., Rodriguez, and Palafox, JJ.

(Do not publish)

18